[No. 49966–7. En Banc. April 24, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. KWAN FAI MAK, *Appellant.*

Raymond H. Thoenig, James E. Lobsenz, and Eric J.

*Nielsen* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Robert S. Lasnik* and *William L. Downing, Senior Deputies,* for respondent.

ANDERSEN, J.—

## FACTS OF CASE

In a crime which set a new gauge for cowardly murder in this state, the Wah Mee Club in downtown Seattle's International District was robbed and all of its patrons and employees were shot in the head. The three armed people who perpetrated this deed held up the club at gunpoint, hog–tied and robbed the men and woman in the club and then systematically shot each of them in the head as they lay bound and helpless. Twelve died there on the floor of the Wah Mee Club; one succumbed shortly afterward at Harborview Hospital; and the 14th victim survived to identify the perpetrators, including the defendant, Kwan Fai Mak, whom he knew.

The evidence presented at trial overwhelmingly established that Mak planned, supervised and helped commit the armed robbery and systematic murder in cold blood of 13 human beings to cover up the robbery of an establishment where he was known.

The jury convicted the defendant of all 13 counts of aggravated murder in the first degree and the 1 count of assault in the first degree with which he was charged. In the special sentencing proceeding which followed conviction, the same jury also unanimously determined beyond a reasonable doubt that no sufficient mitigating circumstances existed to merit leniency. In accordance with this state's capital punishment law, RCW 10.95 (Laws of 1981, ch. 138), the trial judge then sentenced the defendant to be executed.

We have reviewed the entire record of the 2–week trial and have considered the almost 1,000 pages of appellate

briefs filed in this case. We conclude that the defendant was fairly tried, convicted and sentenced under the law and affirm the conviction on all counts and the sentence of death.

The case is before us on mandatory review pursuant to RCW 10.95.100.

## ISSUES

There being 52 assignments of error raising as many issues, each issue will be set out at the same place in the opinion as our decision with respect to that issue, rather than setting all the issues out together at this point in the opinion. For the convenience of counsel, and to avoid unnecessary confusion, we have endeavored to discuss the issues as nearly as possible in the order in which the defendant raised them.

## DECISION

ISSUE ONE. Did the deputy prosecuting attorney, in closing argument during the guilt phase of the trial, present a theory of the case inconsistent with the one presented at the separate trial of one of the other perpetrators of the crime, Benjamin Kin Ng?

CONCLUSION. The record clearly demonstrates that the deputy prosecuting attorney in closing argument at the end of the guilt phase of the case did *not* present a theory of the case inconsistent with the one presented at the other defendant's trial.

 In closing argument, a prosecutor has wide latitude to draw and express reasonable inferences from the evidence.[1] Challenges to remarks made in final argument must be judged in the context in which they are made.[2] Moreover, the trial court has broad discretion in determining whether the challenged portion of the argument affected

---

[1] *State v. Rose,* 62 Wn.2d 309, 312, 382 P.2d 513 (1963); *State v. Harvey,* 34 Wn. App. 737, 739, 664 P.2d 1281 (1983).

[2] *State v. Kroll,* 87 Wn.2d 829, 836, 558 P.2d 173 (1976); *State v. Papadopoulos,* 34 Wn. App. 397, 400–01, 662 P.2d 59 (1983).

the jury's verdict, and the burden of showing prejudicial error is on the defendant.[3]

The defendant claims that at Benjamin Ng's trial the State argued it was Benjamin Ng who held the murder weapon and fired the fatal shots, whereas the State argued in the trial of the present case that it was the defendant Mak who held the same weapon and fired the fatal shots. This, argues the defendant, deprived him of his right to due process. This argument proceeds from a factually incorrect basis and the defendant Mak was not denied due process.

This same contention was made by Benjamin Ng in his appeal. In ruling there was no prejudice or deprivation of due process in that case, we held as follows:[4]

> In both trials the prosecutor argued one basic theory. He maintained that Mak was the master planner who recruited his reliably ruthless friend Ng to help him carry out his plan. The prosecutor also emphasized in both trials that to convict the defendant of aggravated murder, the jury need not determine who actually fired the shots that killed the victims. In Ng's trial, the prosecutor did argue that Ng fired the Ruger. Contrary to Ng's assertion, however, the prosecutor at Mak's trial never argued that Mak fired that gun.
>
> A review of the record indicates that, arguably, the prosecutor presented one factual inconsistency at the two trials. In Ng's trial, the prosecutor argued that the Ruger was Ng's; and, in Mak's trial, he argued that Mak purchased the gun. Even if these arguments are inconsistent, the inconsistency has no bearing on the basic issues at trial. Furthermore, unlike Ng, Mak testified at his trial, placing a new body of evidence on the record. To require the prosecutor to make identical arguments when the record contains different evidence contradicts the well established proposition that a prosecutor may argue reasonable inferences from the facts presented at trial. *See State v. Kroll*, 87 Wn.2d 829, 846, 558 P.2d 173 (1976).

That holding is dispositive of this issue.

---

[3]*Harvey,* at 740.

[4]*State v. Benjamin Ng,* 104 Wn.2d 763, 777–78, 713 P.2d 63 (1985); see also pages 768–70.

ISSUE TWO. Did the trial court err in denying defendant's motion for a mistrial based on a question asked by a deputy prosecuting attorney during cross examination of a defense expert witness?

CONCLUSION. Considering the record as a whole, and bearing in mind that any information the jury may have derived from the question was merely cumulative on the issue of who did the shootings, and that the question went unanswered, we conclude that the defendant was not prejudiced by the question.

At trial the defense called Dr. Phillip Lindsay, a Seattle psychiatrist, as a witness. This witness had testified at the earlier trial of Benjamin Ng that Ng suffered from dementia.

On cross examination, as the deputy prosecutor was questioning Dr. Lindsay concerning the basis of his diagnosis of Ng, the following colloquy occurred:

Q. [Deputy Prosecutor] You took a history from [Benjamin Ng] in regards to head injuries?
A. [Dr. Lindsay] Yes.
Q. And you discussed other aspects of his life with him?
A. Yes.
Q. In terms of making your diagnosis?
A. Right.
Q. And . . . [Ng] told you that it was . . . [the defendant Mak] who shot the people at the . . . [club], didn't he?

At this point defense counsel objected to the question, asked the court to strike it and reserved a motion for mistrial to be argued at the conclusion of the witness' testimony. The trial court sustained the defendant's objection.

After the witness ended his testimony, the jury was excused and the trial court considered the mistrial motion. The court asked the doctor if he had based his diagnosis of the codefendant on statements the codefendant made as to the massacre. The doctor answered in the affirmative. The trial court then denied the defendant's motion for mistrial. The trial proceeded and the question that was originally objected to was neither answered nor ordered stricken by

the court.

The defendant claims that this question placed Benjamin Ng's testimony before the jury and violated his (Mak's) constitutional right to confront his accuser.

Since the trial judge is in the best position to make firsthand observations, he or she is accorded wide discretion in dealing with trial irregularities.[5] The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly. Only errors affecting the outcome of the trial will be deemed prejudicial.[6]

In determining whether a trial irregularity prejudiced the jury so as to deny the defendant his right to a fair trial, we will consider: (1) the seriousness of the irregularity; (2) whether the statement at issue was cumulative evidence; (3) whether the jurors were properly instructed to disregard the remarks of counsel not supported by the evidence; and (4) whether the prejudice was so grievous that nothing short of a new trial could remedy the error.[7]

We cannot conclude that the trial court erred when it denied the defendant's mistrial motion. First, the seriousness of any irregularity was not major. The question was never answered. We perceive no prosecutorial bad faith in asking the question since hearsay statements are generally admissible for purposes of medical diagnosis.[8] Second, it was cumulative on the issue of whether the defendant participated in the shootings. At this point in the trial, evidence had already been presented in the State's case by an interrogating police officer that the defendant (Mak) had

---

[5] *State v. Gilcrist,* 91 Wn.2d 603, 612, 590 P.2d 809 (1979); *State v. Taylor,* 60 Wn.2d 32, 42, 371 P.2d 617 (1962).

[6] *State v. Weber,* 99 Wn.2d 158, 165, 659 P.2d 1102 (1983), quoting *Gilcrist,* at 612; *State v. Hightower,* 36 Wn. App. 536, 547, 676 P.2d 1016 (1984). *See State v. Davenport,* 100 Wn.2d 757, 761–62, 675 P.2d 1213 (1984).

[7] *Weber,* at 165–66.

[8] ER 803(4).

told him that he (Mak) was the one who shot all of the victims.

Third, although it would perhaps have been better had the trial court stricken the question or instructed the jury to disregard it at the time, nonetheless at the end of the trial, the trial court did instruct the jury to disregard all remarks that were not intended as evidence. The jurors are presumed to have followed that instruction.[9]

Finally, before ruling on the motion for mistrial, the trial court fully heard and considered argument by both counsel on the probable impact the unanswered question had on the jury. The record supports the trial court's decision that the defendant was not so prejudiced that he was denied a fair trial.[10]

ISSUE THREE. Did the trial court err in admitting into evidence the firearms seized pursuant to search warrants from the defendant's bedroom and from the bedroom of his confederate Benjamin Ng?

CONCLUSION. The trial court did not abuse its discretion in ruling that the firearms were relevant to the issues of intent and premeditation.

The defendant argues that it was reversible error for the trial court to admit firearms into evidence that were apparently not used in the Wah Mee robbery and murders. He argues that such evidence was prejudicial, inflammatory and violated his constitutional right to bear arms in self-defense.

The admission of relevant evidence is within the sound discretion of the trial court and will not be reversed absent a manifest abuse of that discretion.[11] Relevant evi-

---

[9]*Weber,* at 166.

[10]*State v. Evans,* 96 Wn.2d 1, 5, 633 P.2d 83 (1981); *Hightower,* at 547. *See Davenport,* at 761 n.1.

[11]*Petersen v. State,* 100 Wn.2d 421, 439, 671 P.2d 230 (1983); *Goodell v. ITT–Federal Support Servs., Inc.,* 89 Wn.2d 488, 493, 573 P.2d 1292 (1978); *Maicke v. RDH, Inc.,* 37 Wn. App. 750, 752, 683 P.2d 227 (1984).

dence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[12] Moreover, the trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice.[13] Such determinations are left to the sound discretion of the trial court.[14] Facts tending to establish a party's theory of the case will generally be held to be relevant.[15]

Here, the firearms in question were directly relevant to the issues of intent and premeditation and their probative value outweighed any prejudicial effect. They linked the defendant to Benjamin Ng (Mak had sold guns to Benjamin Ng) and demonstrated the defendant's accessibility to weaponry, a relevant matter in light of the testimony in the case. Moreover, under the facts as testified to, the firearms were probative as to who planned the robbery and murders. Any possibility of undue prejudice was dispelled by the defendant's own testimony wherein he admitted involvement in various illegal activities including illegal firearm sales. There was no error, evidentiary or constitutional, in admitting the firearms into evidence.

*State v. Rupe,* 101 Wn.2d 664, 683 P.2d 571 (1984), relied on by the defendant, is distinguishable. There, firearms owned by the defendant were admitted into evidence at the penalty phase of a capital case. They had no relationship to the crime committed. The State also presented the testimony of several firearms experts. From this the State argued the defendant's dangerousness as a reason to impose the death penalty. In the present case, unlike *Rupe,* there

---

[12]ER 401.

[13]ER 403.

[14]*State v. Coe,* 101 Wn.2d 772, 782, 684 P.2d 668 (1984).

[15]*Fenimore v. Donald M. Drake Constr. Co.,* 87 Wn.2d 85, 89, 549 P.2d 483 (1976); *Maicke,* at 752.

was no argument "that defendant's exercise of that constitutional right (to bear arms) meant that he deserved the death penalty. . ." *Rupe,* at 707.

ISSUE FOUR. Did the trial court err when it denied defendant's discovery request for approximately 800 pages of materials in the Seattle Police Department's internal investigation files?

CONCLUSION. The defendant's claim that the materials in question may have led to evidence critical to his defense was insufficient to establish a showing of materiality that would have compelled the trial court to grant the request.

During a pretrial hearing, the defendant requested that the State turn over these files. The State answered that it had turned over all of the discoverable material from the file. The trial court conducted a "spot check" in camera review of the materials in question and when that bore out the State's assertions, it denied the request.

The defendant now claims that the trial court's failure to preserve the files contravenes the discovery rules and denies him his right to appeal.

The prosecuting attorney is under a duty to disclose and to preserve evidence that is material and favorable to the defendant and a failure to do so will generally be held to violate the accused's constitutional right to a fair trial.[16] Additionally, however, the scope of discovery is within the sound discretion of the trial court and will not be disturbed absent a manifest abuse of that discretion.[17]

█ If an accused requests further disclosure, he must show that the requested information is material to the preparation of the accused's defense.[18] The mere *possibility*

---

[16]*Brady v. Maryland,* 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963); *State v. Coe,* 101 Wn.2d 772, 783, 684 P.2d 668 (1984); *State v. Renfro,* 28 Wn. App. 248, 251, 622 P.2d 1295 (1981), *aff'd,* 96 Wn.2d 902, 639 P.2d 737, *cert. denied,* 459 U.S. 842, 74 L. Ed. 2d 86, 103 S. Ct. 94 (1982); CrR 4.7.

[17]*State v. Lauterbach,* 33 Wn. App. 161, 168, 653 P.2d 1320 (1982).

[18]CrR 4.7(e)(1).

that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial, however, does not establish "materiality" in the constitutional sense.[19]

Our review of the record in this case demonstrates the speculative nature of the defendant's claim concerning the files sought. He made no showing that the requested information was material to his defense. To the contrary, his claim is that the files "*may have* contained information critical to the defense"[20] or "*might lead* to other evidence."[21] This is not sufficient to establish a showing of materiality such as to compel the court to grant a discovery request.[22] Moreover, nothing at trial suggested the availability or withholding of any exculpatory information that could have affected the outcome of the trial.[23] That being so, the trial court was not required to conduct an in camera review of the Seattle Police Department's internal investigative files, and it is not necessary for this court to address the assigned error questioning the propriety of the in camera review and the record made thereof. The trial court did not abuse its discretion in denying the defendant's discovery request.

ISSUE FIVE. Did the trial court err in excusing a prospective juror for cause because the juror could not impose the death penalty?

CONCLUSION. The trial court properly ascertained that the prospective juror in question held an actual bias against the

---

[19]*United States v. Agurs*, 427 U.S. 97, 112–13, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976); *State v. Gerber*, 28 Wn. App. 214, 218, 622 P.2d 888 (1981); *State v. Hudspeth*, 22 Wn. App. 292, 294, 593 P.2d 548 (1978). *Cf. State v. Dictado*, 102 Wn.2d 277, 298–99, 687 P.2d 172 (1984).

[20]Opening Brief of Appellant, at 122.

[21]Opening Brief of Appellant, at 129.

[22]*See State v. Gerber, supra.*

[23]*See Dictado*, at 298.

death penalty, and did not abuse its discretion in granting the State's challenge to the juror for cause.

During voir dire examination, the following colloquy occurred with the juror who was excused for cause:

Q. [The Court]: If we get to the penalty phase, one of the penalties that will be considered is death. How would you best describe your feelings about the death penalty? . . .

. . .

A. [Prospective Juror]: I'm a Christian and as I've studied the life of Christ . . . I have come to the conclusion that I could not push the button myself, I'm sure.

. . .

Q. If you sat as a juror and went back to the jury room, and you were convinced beyond a reasonable doubt that the State had proven death was the proper sentence under the facts and under the law, could you answer that question yes?
A. No.

The prospective juror was then excused.

The defendant claims that by excluding this prospective juror for cause because of her inability to impose the death penalty due to her religious beliefs, the trial court violated Const. art. 1, § 11 which prohibits exclusion of a juror "in consequence of his opinion on matters of religion".

The Legislature has provided that either party to an action may excuse a prospective juror by peremptory challenge or for cause.[24] Challenges for cause may be either general or particular.[25] Particular causes of challenge can be for: (1) "such a bias as when the existence of the facts is ascertained, in judgment of law disqualifies the juror" (implied bias);[26] (2) "the existence of a state of mind on the part of the juror in reference to the action . . . which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial

---

[24]RCW 4.44.130.

[25]RCW 4.44.150.

[26]RCW 4.44.170(1).

rights of the party challenging" (actual bias);[27] (3) or the existence of a physical defect that would render the juror incapable of performing his or her duties without prejudicing the substantial rights of the party challenging.[28]

If the trial court determines that a prospective juror is actually or impliedly biased, then that juror must be excused for cause.[29] However, a juror with preconceived ideas need not be disqualified if he or she can "'put these notions aside and decide the case on the basis of the evidence given at the trial and the law as given him by the court.'"[30]

■ The law in this state is settled; a trial court does not abuse its discretion by excusing a prospective juror for cause in a capital case when the prospective juror will not impose the death penalty.[31] In determining whether a prospective juror was properly excused for cause because of his or her inability to impose the death sanction, reviewing courts focus on whether the juror holds an actual or an implied bias.[32] In rejecting an argument like the one made here, this court in *State v. Leuch,* 198 Wash. 331, 336–37, 88 P.2d 440 (1939), quoting *People v. Rollins,* 179 Cal. 793, 797, 179 P. 209 (1919) observed:

---

[27]RCW 4.44.170(2).

[28]RCW 4.44.170(3).

[29]*State v. Gosser,* 33 Wn. App. 428, 433, 656 P.2d 514 (1982); *see* RCW 4.44-.170; CrR 6.4(c)(1).

[30]*Gosser,* at 433, quoting *State v. White,* 60 Wn.2d 551, 569, 374 P.2d 942 (1962), *cert. denied,* 375 U.S. 883, 11 L. Ed. 2d 113, 84 S. Ct. 154 (1963); RCW 4.44.190.

[31]*State v. Jeffries,* 105 Wn.2d 398, 411, 717 P.2d 722 (1986); *State v. Leuch,* 198 Wash. 331, 335–37, 88 P.2d 440 (1939); *see Witherspoon v. Illinois,* 391 U.S. 510, 520, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968).

[32]*See Wainwright v. Witt,* 469 U.S. 412, 83 L. Ed. 2d 841, 105 S. Ct. 844 (1985); *State v. Smith,* 74 Wn.2d 744, 779, 446 P.2d 571 (1968), *vacated in part,* 408 U.S. 934, 33 L. Ed. 2d 747, 92 S. Ct. 2852 (1972); *Leuch,* at 335–37.

Certainly the constitutional provision cannot be held to preclude legislation reasonably looking to the exclusion by challenge from a jury in any case of any person whose mind is in such condition from any cause whatever that he cannot try and determine the cause in accord with the law applicable thereto.[33]

The portion of the record quoted shows that the prospective juror in the instant case demonstrated actual bias against the death penalty.[34] The court asked the juror if she could impose the death penalty and she responded in the negative. The trial court did not err in removing the juror for cause.[35]

ISSUE SIX. Did the trial court err in denying defendant's motion to sequester the jury during the entire trial?

CONCLUSION. Given the extensive protective measures the trial court used to insure that the jurors were not prejudiced by the publicity on the case, the trial court did not abuse its discretion when it allowed the jury to separate prior to commencing deliberations.

The defendant argues that the newspaper coverage of this case was sensational, inflammatory, uninterrupted and massive; and that the trial court, therefore, abused its discretion in allowing the jury to separate prior to retiring to deliberate on the verdict.

▮ In this state, a trial judge has broad discretion in determining whether or not a jury should be sequestered during the trial, prior to deliberations.[36] For a defendant to claim abuse of that discretion, the record must indicate that either the nature of the publicity during the trial or the jury's exposure to that publicity created a probability of

---

[33]*See also People v. Fields*, 35 Cal. 3d 329, 673 P.2d 680, 197 Cal. Rptr. 803 (1983), *cert. denied*, 469 U.S. 892, 83 L. Ed. 2d 204, 105 S. Ct. 267 (1984).

[34]*See* RCW 4.44.170(2).

[35]*See State v. Jeffries, supra; State v. Leuch, supra; State v. Gosser, supra.*

[36]*Dictado*, at 299; *State v. Wixon*, 30 Wn. App. 63, 74, 631 P.2d 1033 (1981).

prejudice.[37]

The record is clear. The trial court took extensive measures to insure that the jury was not prejudiced by any outside publicity regarding the case. During jury selection, for example, the trial court itself conducted individual voir dire of prospective jurors to determine the impact of pretrial publicity. It also required prospective jurors to answer detailed questionnaires aimed at assessing such impact. Once the trial began, the jurors were instructed daily that they were to avoid any exposure to media reports on the trial and the importance of this was repeatedly impressed upon them. Every day from arrival in the morning to dismissal at the end of the day, the jury was kept together under supervision of the bailiff. Finally, the jury was sequestered when it undertook deliberations on the guilt phase of the case and then throughout the penalty phase of the trial. Although this case did receive widespread media coverage both before and during the trial, the coverage was primarily factual and no showing has been made that the jury was actually exposed to any of it. The trial court did not abuse its discretion in declining to sequester the jury during this long trial prior to its beginning deliberations.[38]

ISSUE SEVEN. Did the trial court err in the rulings it made during cross examination of two witnesses for the State?

CONCLUSION. Although an accused in a criminal prosecution is afforded great latitude in cross–examining State's witnesses to show bias, the scope of such cross examination remains within the sound discretion of the trial court and the trial court's ruling will not be disturbed absent a showing of abuse. Under the facts, no such abuse was shown here.

At trial, the defendant proposed to cross–examine two of the State's witnesses as to their participation with the

---

[37]*State v. Benjamin Ng,* 104 Wn.2d 763, 776, 713 P.2d 63 (1985); *Dictado,* at 299.

[38]*See Wixon,* at 74.

defendant in an alleged 1981 robbery. The defense hoped to thereby establish that these witnesses were accorded favorable treatment by the authorities in exchange for their testimony in this trial.

The proposed defense cross examination of the first witness would have revealed that after he provided the police with information as to the defendant's attempt to recruit him for the Wah Mee robbery and killings, he then confessed to a 1981 robbery involving both himself and the defendant. The trial court ruled that the cross examination of this witness as to his motives in providing information to the police would open the door to redirect examination concerning the context in which he initially provided the information. This would have allowed the State, on redirect, to question the witness with respect to the 1981 robbery. Because of this ruling, defense counsel did not cross–examine this witness as to his motives for testifying.

As to the second witness, the proposed defense cross examination would have revealed that several months after providing police with information connecting the defendant to the Wah Mee massacre, he too admitted his involvement with the defendant in the 1981 robbery. The trial court ruled that the proffered cross examination was an "insufficient foundation to establish bias", and was, therefore, irrelevant.

The defendant assigns error to the trial court's ruling that impeachment of these two prosecution witnesses would open the door to evidence on redirect that the defendant participated in the uncharged robbery.

■ The scope of cross examination lies within the sound discretion of the trial court and will not be disturbed absent a manifest abuse of that discretion.[39] The accused in a criminal prosecution is, of course, afforded considerable latitude in cross–examining an essential state witness to

---

[39]*State v. Campbell,* 103 Wn.2d 1, 20, 691 P.2d 929 (1984), *cert. denied,* __ U.S. __, 85 L. Ed. 2d 526, 105 S. Ct. 2169 (1985); *State v. Knapp,* 14 Wn. App. 101, 107–08, 540 P.2d 898 (1975); ER 611.

show bias,[40] and has the right to cross–examine a witness to elicit facts showing the witness' bias, prejudice or interest.[41]

▮ As this court held in an analogous situation in *State v. Gefeller,* 76 Wn.2d 449, 455, 458 P.2d 17 (1969), however:

> It would be a curious rule of evidence which allowed one party to bring up a subject, drop it at a point where it might appear advantageous to him, and then bar the other party from all further inquiries about it. Rules of evidence are designed to aid in establishing the truth. To close the door after receiving only a part of the evidence not only leaves the matter suspended in air at a point markedly advantageous to the party who opened the door, but might well limit the proof to half–truths. Thus, it is a sound general rule that, *when a party opens up a subject of inquiry on direct or cross–examination, he contemplates that the rules will permit cross–examination or redirect examination, as the case may be, within the scope of the examination in which the subject matter was first introduced.*

(Citations omitted. Italics ours.) The trial court did not abuse its discretion in ruling as it did.[42]

ISSUE EIGHT. Did the trial court err when it denied defendant's motion to suppress evidence seized during a search of the defendant's bedroom pursuant to a search warrant?

CONCLUSION. The trial court carefully weighed the testimony and found as a fact that the police had valid consent when they initially entered the defendant's home and bedroom. The subsequent issuance of the search warrant was, therefore, proper and the trial court did not err when it declined to suppress the evidence obtained as a result of the search conducted pursuant to the search warrant.

---

[40]*Knapp,* at 107–08, citing *State v. Tate,* 2 Wn. App. 241, 247, 469 P.2d 999 (1970).

[41]*Knapp,* at 108, citing *State v. Robbins,* 35 Wn.2d 389, 396, 213 P.2d 310 (1950).

[42]*See Knapp,* at 107–08; ER 403; ER 611.

The defendant argues that the consent to search the defendant's bedroom was not given freely or voluntarily; thus, he claims that the evidence seized pursuant to the search warrant was obtained by exploitation of the prior illegality, namely invalid consent, and should be suppressed. We disagree.

On this issue, the trial court found the following facts:

> The officers knocked on the door which was opened by defendant's father. Defendant's brother soon appeared. Sergeant Sanford showed his badge, briefly informed the two individuals in the residence of the homicides and the fact that he was looking for Kwan Mak and Benjamin Ng. He asked if they could come in. In response to this the father opened the door further and nodded. The brother made a response indicating in the affirmative.

Finding of fact 7.

> Once inside, the officers asked if defendant or Ben Ng were present. The brother responded that Ben Ng was not but that he wasn't sure if defendant was.

Finding of fact 8.

> Once inside, Sergeant Sanford asked if they could check to verify defendant's presence or absence. The father indicated assent, pointed out the bedroom of defendant, and said "Willie".

Finding of fact 9.

> Sergeant Sanford opened the door and entered the bedroom and patted down the bulging bedcovers. While in the room he observed in plain view a holstered handgun and what appeared to be a large amount of cash.

Finding of fact 10.

Reviewing courts place considerable weight on trial courts' findings of fact, especially when the findings arise out of contradictory testimony.[43] Nevertheless, the reviewing court will make its own independent examination of the record when fundamental constitutional rights are involved.[44] The search of property, without a warrant and

---

[43]*McNear v. Rhay*, 65 Wn.2d 530, 535, 398 P.2d 732 (1965).

[44]*McNear*, at 535.

without probable cause, but with proper and voluntary consent, is valid under the Fourth Amendment.[45] Whether the consent was given freely or not is a question of fact to be determined by the totality of the circumstances,[46] and the burden is on the State to show by clear and convincing evidence that the consent was informed and given freely and voluntarily.[47]

The trial court heard and believed the testimony of the investigating detective and, based on that testimony and reasonable inferences therefrom, found that consent to enter the house and bedroom was freely given. Moreover, only "plain view" observations were thereafter made until the search warrant was issued. Based on our review of the record, we conclude that the totality of circumstances support the trial court's findings.[48]

ISSUE NINE. Did the trial court err in ruling that the search warrant affidavit contained no material misrepresentation?

CONCLUSION. The affidavit in support of the search warrant did not contain material misrepresentations. The search warrant was proper and the trial court did not err by refusing to suppress the evidence obtained as a result of it.

The affidavit states that the sole survivor identified two of the gunmen as the codefendant and "an individual known to . . . [the sole survivor] by the . . . [defendant's] last name". A tape was made of this statement and was placed in evidence for the trial court to hear. After listening to the tape, the trial court concluded that the survivor did in fact state the defendant's name and declined to suppress the evidence obtained as a result of the search conducted

---

[45]*State v. Mathe*, 35 Wn. App. 572, 576, 668 P.2d 599 (1983). *See McNear*, at 535; *State v. Rodriguez*, 32 Wn. App. 758, 763, 650 P.2d 225 (1982).

[46]*Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973); *Mathe*, at 576.

[47]*State v. Shoemaker*, 85 Wn.2d 207, 210, 533 P.2d 123 (1975); *Mathe*, at 576.

[48]*See McNear*, at 535–37; *Mathe*, at 576–77.

pursuant to the warrant.

The defendant argues, however, that the tape establishes that the sole survivor identified another individual and that, therefore, the evidence recovered as a result of using the search warrant should be suppressed.

An accused is entitled to challenge the validity of a search warrant affidavit.[49] The duty of the issuing judge is to determine whether probable cause exists to issue a warrant, and that determination will be accorded considerable deference by appellate courts.[50] Doubts will be resolved in favor of the search warrant.[51]

In this case, the trial court's decision to admit the evidence is independently supported by the defendant's own testimony. At trial the defendant admitted that he had listened to the tape and acknowledged that the survivor had used his last name. The showing made to the magistrate was sufficient and no abuse of discretion in issuing the search warrant was shown.[52] The search undertaken pursuant to the search warrant was valid.

ISSUE TEN. Did the trial court err in refusing to allow proffered expert testimony on eyewitness identification in the guilt phase of the trial?

CONCLUSION. The trial court did not err by declining to admit the testimony on eyewitness identification.

During the guilt phase of the trial, defense counsel offered to have a witness testify as an expert concerning factors that can make eyewitness identification unreliable. In granting the State's motion to exclude this witness' testimony, the trial court appropriately observed that the "subject of the testimony is within the general knowledge

---

[49]*Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978); *State v. Haywood*, 38 Wn. App. 117, 120, 684 P.2d 1337 (1984).

[50]*State v. Hightower*, 36 Wn. App. 536, 543, 676 P.2d 1016 (1984).

[51]*State v. Fisher*, 96 Wn.2d 962, 964, 639 P.2d 743, *cert. denied*, 457 U.S. 1137, 73 L. Ed. 2d 1355, 102 S. Ct. 2967 (1982).

[52]*See Hightower*, at 544.

and experience of a lay jury" and that cross examination of the eyewitness would reveal any inconsistencies.

The defense submitted an offer of proof outlining the offered testimony. It indicated that the witness would have testified that: (1) persons suffering from retrograde amnesia may not be aware of its existence; (2) a person experiencing gaps in memory or perception fills in the gaps in order to complete the logical picture within the mind; (3) suggestive questioning immediately following the incident influences the type of information the person uses to fill the gaps; (4) post–event information is also used by the person to fill the gaps; and (5) the subject's confidence in his version of the facts increases each time it is recalled and recounted to another.

The defendant argues that the trial court abused its discretion by not allowing the witness to testify and cites ER 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The decision of whether or not to admit expert opinion evidence is within the discretion of the trial court,[53] and we will not disturb a discretionary ruling of this sort absent a showing of abuse.[54] There was no abuse shown here.

ISSUE ELEVEN. Did the trial court err in excluding, at both the guilt and penalty phases of the trial, evidence concerning a claimed accomplice of the defendant?

CONCLUSION. The trial court did not abuse its discretion in excluding this testimony.

At trial, defense counsel offered evidence that it is

---

[53]*State v. Cook,* 31 Wn. App. 165, 174, 639 P.2d 863 (1982); *see State v. Guloy,* 104 Wn.2d 412, 705 P.2d 1182 (1985).

[54]*State v. Petrich,* 101 Wn.2d 566, 575, 683 P.2d 173 (1984). *See* ER 702.

claimed would connect a third party to the crimes at the Wah Mee Club. The offer of proof consisted of the following: (1) a certain third party had a plan to control gambling in the International District; (2) that party contacted Benjamin Ng, one of the perpetrators of the crimes at the Wah Mee Club, on the day of the robbery and killings; (3) Benjamin Ng's car was at that party's restaurant for an hour before the crime; (4) that party offered to sell Ng a bulletproof vest a week before the crime; (5) the party was a "banker" for an International District gambling club that had just closed down; and (6) an anonymous informant told police that this party directed young gang members. The trial court ruled that the defendant's offer of proof did not connect the third party to the crime with "the necessary specific factual connection" to render it admissible.

The defendant argues that in ruling as it did the trial court deprived the jury of critical evidence at the guilt phase of the trial and therefore committed error.

 Before a defendant can introduce evidence connecting another person with the crime charged, a proper foundation must be laid.[55] The rule is stated in *State v. Downs,* 168 Wash. 664, 667, 13 P.2d 1 (1932):

> Before such testimony can be received, there must be such proof of connection with the crime, such a train of facts or circumstances as tend clearly to point out someone besides the accused as the guilty party.

(Citations omitted.) The rationale for this rule is perhaps best explained in a California case, *People v. Mendez,* 193 Cal. 39, 52, 223 P. 65 (1924), cited with approval by this court in *State v. Kwan,* 174 Wash. 528, 533, 25 P.2d 104 (1933):

> It seems to us that there is a sound basis for this rule and that it rests fundamentally upon the same consideration which led to the early adoption of the elementary rules that evidence to be admissible must be both

---

[55]*State v. Jones,* 26 Wn. App. 551, 555, 614 P.2d 190 (1980), citing *State v. Kwan,* 174 Wash. 528, 25 P.2d 104 (1933); *State v. Downs,* 168 Wash. 664, 13 P.2d 1 (1932).

relevant and material. It rests upon the necessity that trials of cases must be both orderly and expeditious, that they must come to an end, and that it should be a logical end. To this end it is necessary that the scope of inquiry into collateral and unimportant issues must be strictly limited. It is quite apparent that if evidence of motive alone upon the part of other persons were admissible, that in a case involving the killing of a man who had led an active and aggressive life it might easily be possible for the defendant to produce evidence tending to show that hundreds of other persons had some motive or *animus* against the deceased; that a great many trial days might be consumed in the pursuit of inquiries which could not be expected to lead to any satisfactory conclusion.

The trial record reveals that several items that the defendant offered to prove did come to light through the testimony of other witnesses, but failed to support defense counsel's offer of proof. The only connection shown between the alleged "accomplice" and the crimes at the Wah Mee Club was a hearsay statement whereby this claimed accomplice offered to sell Benjamin Ng a bulletproof vest a week before the crimes were committed at the Wah Mee Club. Contrary to defendant's contention, this statement is hearsay because it was offered to prove the truth of the matter stated—that the alleged accomplice offered to sell a bulletproof vest to Benjamin Ng.[56] The offer of proof did not satisfy the *Downs* test. Based on the lack of proper foundation, the trial court did not abuse its discretion by denying admission of the evidence.

During the special sentencing proceeding, the defendant again offered this same evidence, and again, the trial court excluded the evidence on relevancy grounds.

Defendant argues that in light of our holding in *State v. Bartholomew*, 101 Wn.2d 631, 645, 683 P.2d 1079 (1984) (*Bartholomew* II), the evidence should at least have been admitted in that phase of the trial. However, as *Bartholomew* II pointed out:

---

[56]*See* ER 801(c); ER 802.

The Washington capital punishment statute requires admission at the sentencing phase of "any relevant evidence which it deems to have probative value regardless of its admissibility under the rules of evidence . . ." RCW 10.95.060(3). We have restricted this provision to evidence in mitigation of punishment. *Therefore, only evidence which is not probative or not relevant is excluded at the sentencing phase.*

(Italics ours.)[57]

The defendant's proffered evidence in this regard was neither relevant nor probative.

ISSUE TWELVE. Did the trial court err when it allowed a police officer to testify that he was familiar with the defendant's last name prior to the crimes involved in this case?

CONCLUSION. We decline to review an argument based on one rule of evidence when the objection at trial was made on the basis of a different rule of evidence.

The police officer in charge of the investigation testified on redirect examination that he was familiar with the defendant's last name before he heard it mentioned in connection with this case. Defense counsel objected on the ground it was not relevant. In the context in which this came out, it was clearly relevant, and the trial court properly overruled the objection.[58] Now, the defendant argues that the trial court should have sustained the objection because it violated the rule excluding evidence of other crimes.[59] No objection was made at trial on this basis.

▮▮▮ As we recently reiterated in *State v. Ferguson*, 100 Wn.2d 131, 138, 667 P.2d 68 (1983),

---

[57]*State v. Bartholomew*, 101 Wn.2d 631, 645, 683 P.2d 1079 (1984) (*Bartholomew* II). *See also State v. Rupe*, 101 Wn.2d 664, 691, 683 P.2d 571 (1984); *State v. Grisby*, 97 Wn.2d 493, 503, 647 P.2d 6 (1982), *cert. denied*, 459 U.S. 1211, 75 L. Ed. 2d 446, 103 S. Ct. 1205 (1983).

[58]ER 401, 402.

[59]ER 404(b).

it is well established that

> [i]f a specific objection is overruled and the evidence in question is admitted, the appellate court will not reverse on the basis that the evidence should have been excluded under a different rule which could have been, but was not, argued at trial.

5 K. Tegland, Wash. Prac., *Evidence* § 10, at 25 (2d ed. 1982); ER 103. The claimed error also does not warrant review as an error raised for the first time on appeal under RAP 2.5.

ISSUE THIRTEEN. Did the trial court err when it denied the defendant's motion for mistrial based on an improper remark made by one of the detectives who searched the defendant's bedroom?

CONCLUSION. Considering the record as a whole, and particularly the trial court's instruction to the jury to disregard the detective's remark, the defendant was not prejudiced.

At the beginning of the trial the defendant moved in limine to exclude any reference to marijuana found during the search of defendant's bedroom. The parties agreed that no such testimony would be presented. During the testimony of one of the detectives who searched the defendant's bedroom, however, he mentioned a "small baggie of green vegetable matter" found in the defendant's bedroom. Defense counsel objected and the jury was instructed to disregard it. The jury was excused and the deputy prosecutor apologized for the officer's violation of the trial court's ruling. Defense counsel's motion for a mistrial was denied.

Defendant argues that although this error may not by itself warrant a new trial, when taken in conjunction with numerous other errors it does warrant reversal. We disagree.

Again, the trial judge being in the best position to evaluate the potential prejudice of such a remark, the claimed error will be reviewed under the abuse of discretion standard.[60] As we read the record, the remark appears inadver-

---

[60]*State v. Weber,* 99 Wn.2d 158, 166, 659 P.2d 1102 (1983); *State v. Hightower,* 36 Wn. App. 536, 547, 676 P.2d 1016 (1984).

tent. Furthermore, against the factual backdrop of this case, the mention of finding some "green vegetable matter" in the defendant's closet is not reversible error whether considered alone or in conjunction with other claimed errors. The defendant himself later testified that he wanted to be involved in drug dealing. As discussed previously, a mistrial should be granted only when a defendant has been so prejudiced that nothing short of a new trial can insure that he will be tried fairly.[61] No such prejudice was shown in this case at any time.

ISSUE FOURTEEN. Should the trial court have impaneled a new jury for the penalty phase of the trial because, at the guilt phase of the trial, the jury heard evidence of the defendant's involvement in a committed but uncharged crime as well as about the planning of three other crimes which were never committed?

CONCLUSION. The capital punishment statutes mandate that the only time the trial court may impanel a new jury for the penalty phase is when unforeseen circumstances make it impracticable to reconvene the same jury. There were no such circumstances here; hence, error was not committed in this regard.

During the guilt phase of the trial, the State presented evidence of two planned robberies and a planned burglary where, according to the plans, witnesses were to be killed (but which crimes were never committed) and one robbery that was committed where the victim was bound by tape. According to this testimony, the defendant was implicated in all of these. The trial court concluded that such evidence was relevant and probative to the issues of the defendant's intent, knowledge and purpose in going armed to the Wah Mee Club, as well as to rebut his own testimony to the effect that he had no idea the robbery or killings would occur at the club. The trial court properly balanced and weighed the probative value of the evidence against its

---

[61]*State v. Gilcrist,* 91 Wn.2d 603, 612, 590 P.2d 809 (1979).

potential for prejudice before admitting it.[62]

Then, in the penalty phase of the trial, the trial court instructed the jury that it could consider all of the evidence previously admitted during the guilt phase. The defendant now challenges the use of this evidence during the penalty phase.

The capital punishment statutes require that if a defendant's guilt is determined by a jury, the same jury "shall" hear the penalty phase of the trial unless "unforeseen circumstances" make it impracticable to reconvene the same jury, in which event the trial court will impanel a new jury.[63] Absent contrary legislative intent, "shall" is mandatory.[64] Thus, absent unforeseen circumstances, the trial court is required to reconvene the same jury for the penalty phase of the trial.[65]

The evidence in question related to the statutory aggravating circumstances found by the jury in the guilt phase of the case.[66] It was properly admitted in the guilt phase; therefore, it was admissible in the penalty phase.[67] Such evidence did not constitute a showing of "unforeseen circumstances" requiring the impaneling of a new jury at the penalty phase of the case.

ISSUE FIFTEEN. Is the defendant's death sentence excessive or disproportionate to the penalty imposed in similar cases?

CONCLUSION. We hold that it is not.

---

[62]*State v. Saltarelli,* 98 Wn.2d 358, 361–63, 655 P.2d 697 (1982).

[63]RCW 10.95.050(3), (4).

[64]*State ex rel. Nugent v. Lewis,* 93 Wn.2d 80, 82, 605 P.2d 1265 (1980).

[65]*State v. Bartholomew,* 98 Wn.2d 173, 224, 654 P.2d 1170 (1982) (Dolliver, J., concurring in part, dissenting in part) (*Bartholomew* I), *State's cert. granted,* 463 U.S. 1203, 77 L. Ed. 2d 1383, 103 S. Ct. 3530, *defendant's cert. denied,* 463 U.S. 1212, 77 L. Ed. 2d 1395, 103 S. Ct. 3548 (1983).

[66]*See* RCW 10.95.020(7); RCW 10.95.020(9)(a).

[67]*Bartholomew* II, at 643.

In reviewing a defendant's death sentence, one of the things we are required to determine is "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both *the crime and the defendant.*" (Italics ours.) RCW 10.95.130(2)(b).

First, we consider "the crime". Insofar as the proportionality of this crime to other crimes is concerned, we need say only that so far as we have been able to ascertain, this is the largest mass premeditated murder in our state's history. The defendant does not seem to suggest otherwise. Instead, he argues that since at the penalty phase of the trial of his confederate in crime (Benjamin Ng), the jury could not unanimously agree[68] (thus sparing Benjamin Ng's life), it follows that his (Mak's) death penalty for the same crimes is disproportionate. This does not follow.

Recently, in *State v. Kincaid,* 103 Wn.2d 304, 310–11, 692 P.2d 823 (1985), we summarized Washington law relating to the crime of aggravated first degree murder and the penalty therefor:

> The statute provides for a bifurcated procedure. At the first, the guilt phase of the trial, it is determined whether the defendant is guilty of premeditated murder in the first degree, and, if so, it is then determined whether one or more of the statutory aggravating circumstances exist. If the death penalty has not been asked [as it was not, in *Kincaid*], the defendant who is found guilty of premeditated murder in the first degree where one or more aggravating circumstances exist, is sentenced to life imprisonment without possibility of parole; but, if the death penalty is sought, the trial then shifts into a separate capital sentencing phase where it is determined whether there are sufficient mitigating circumstances to merit leniency and, if not, the death penalty is imposed.
>
> Washington statutes thus provide three levels of punishment for persons convicted of premeditated first degree murder. Persons convicted of premeditated first degree murder alone are sentenced to life imprisonment with possibility of parole. Persons convicted of premeditated first degree murder, where one or more of the stat-

---

[68]*State v. Benjamin Ng,* 104 Wn.2d 763, 713 P.2d 63 (1985).

utory aggravating circumstances are found, and the death penalty is not sought or obtained, are sentenced to mandatory life imprisonment. And persons convicted of premeditated first degree murder, where one or more of the statutory aggravating circumstances are found, and where the death penalty is sought, are sentenced to death if it is determined that there are not sufficient mitigating circumstances to merit leniency. It is the existence of one or more of the statutory aggravating circumstances which satisfies the constitutional imperative of narrowing the class of persons eligible for the death penalty and which justifies the imposition of the more severe sentence.

(Footnotes omitted.)

It is important that at the penalty phase there be an individualized determination on the basis of the character of "the defendant" (*see* RCW 10.95.130(2)(b)) as well as on the basis of the circumstances of the crime.[69] It is the purpose of channeled discretion statutes, such as ours, to avoid the vice of failing "to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death."[70]

As observed in *State v. Campbell*, 103 Wn.2d 1, 40, 691 P.2d 929 (1984) (Rosellini, J., concurring), *cert. denied,* ___ U.S. ___, 85 L. Ed. 2d 526, 105 S. Ct. 2169 (1985):

At four specific points, the statutory scheme narrows the class of persons subject to the death penalty: first, on the basis of specific elements of aggravated murder; second, with the prosecutor's decision to seek the death penalty for lack of mitigating circumstances; third, with the jury's consideration of mitigating circumstances; and fourth, with this court's ultimate review of the prior proceedings. This compares favorably with the Georgia plan

---

[69]*State v. Campbell*, 103 Wn.2d 1, 40, 691 P.2d 929 (1984) (Rosellini, J., concurring) (citing *Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235, 251, 103 S. Ct. 2733 (1983)), *cert. denied,* ___ U.S. ___, 85 L. Ed. 2d 526, 105 S. Ct. 2169 (1985).

[70]*Woodson v. North Carolina*, 428 U.S. 280, 303, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976). *See Gregg v. Georgia*, 428 U.S. 153, 189, 49 L. Ed. 2d 859, 96 S. Ct. 2909, *reh'g denied*, 429 U.S. 875, 50 L. Ed. 2d 158, 97 S. Ct. 197 (1976).

upheld in *Zant v. Stephens,* [462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983)].

As required by the United States Supreme Court, Washington's aggravated first degree murder statutes thus allow particularized consideration of relevant aspects of the character and record of individuals to be considered before imposition of the death penalty. Thus, it is obvious that every defendant who commits the same type of crime, or indeed the same crime, will not necessarily be given the same penalty. This does not necessarily mean that the difference is based on prejudice or disproportionality; it simply means that if there are demonstrable differences shown in the character and record of the defendants, the penalties may not be disproportionate considering *"the defendant"*.

As the United States Supreme Court expressed it:

> Any capital sentencing scheme may occasionally produce aberrational outcomes. Such inconsistencies are a far cry from the major systemic defects identified in *Furman* [*Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972)]. As we have acknowledged in the past, "there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death.'" *Zant* v. *Stephens,* [462 U.S. 862, 884, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983)], quoting *Lockett* v. *Ohio,* 438 U. S. 586, 605[, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978)].

*Pulley v. Harris,* 465 U.S. 37, 54, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984). And as that Court also said in *Gregg v. Georgia,* 428 U.S. 153, 199, 49 L. Ed. 2d 859, 96 S. Ct. 2909, *reh'g denied,* 429 U.S. 875, 50 L. Ed. 2d 158, 97 S. Ct. 197 (1976):

> Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the constitution.

In the case before us, the imposition of capital punishment on the defendant Mak, although it was not imposed on his confederate, Benjamin Ng, was not an "aberrational outcome". The evidence of mitigation and the defendants' respective roles in the crime were different. In Ng's case, the jury heard three medical/psychiatric experts testify that

Ng suffered from dementia as the result of a childhood head injury aggravated by a later beating.[71] On the other hand, the jury in the defendant Mak's case had evidence before it from which it could reasonably conclude that there were no mitigating circumstances meriting leniency except perhaps for his youth (apparently he was 22 at the time); that it was the defendant Mak who for years had planned to rob a gambling club and eliminate the witnesses; that it was the defendant Mak who tried to recruit others to assist in the crime; that, as the sole survivor testified, it was the defendant Mak who, with a gun in his hand, stood above the victims like a leader issuing orders; and, in short, that it was the defendant Mak who planned, supervised and helped carry out the robbery and murders.

Significantly, the jury in the defendant Mak's case was not unaware of the outcome of Benjamin Ng's case. The jury in the Mak case heard testimony concerning Benjamin Ng's mandatory life sentence, and also heard testimony about a prior murder committed by Ng (which the jury in Ng's case did not hear because of evidentiary bars laid down by this court in prior death penalty cases).[72] Despite that, and despite the fact that the jury heard testimony from which it could conclude that Benjamin Ng was the principal triggerman (or, arguably, the sole triggerman), it returned a special verdict that in the defendant Mak's case, there were not sufficient mitigating circumstances to merit leniency.

In sum, nothing suggests that the death penalty was arbitrarily or capriciously imposed against the defendant

---

[71]A statutory mitigating factor relied on by Ng was RCW 10.95.070(6): "Whether, at the time of the murder, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired as a result of mental disease or defect;" see *State v. Benjamin Ng,* Report of the Trial Judge, at 6.

[72]*See Bartholomew* I, 98 Wn.2d at 197; *State v. Bartholomew,* 101 Wn.2d 631, 638–39, 683 P.2d 1079 (1984) (*Bartholomew* II).

Mak,[73] or that it was excessive or disproportionate considering both the crime and the defendant.

ISSUE SIXTEEN. Did a deputy prosecuting attorney, in closing argument at the penalty phase of the trial, violate the defendant's constitutional right to a fair and impartial trial, due process of law and privilege against self–incrimination?

CONCLUSION. Nothing in the record before us suggests that the deputy prosecutor's closing argument during the penalty phase of the trial inappropriately affected the jury's verdict.

In closing argument, the prosecuting attorney has a wide latitude in drawing and expressing reasonable inferences from the evidence.[74] A prosecutor arguing to a jury may not, of course, interject his or her personal beliefs into the case, but certainly may comment on the credibility of witnesses.[75] Any statements as to the law in closing argument are to be confined to the law set forth in the instructions.[76] So far as improper argument is concerned, it is the defendant who bears the burden of establishing not only the impropriety of the prosecutor's remarks, but also their prejudicial effect. The issue is then whether there is a substantial likelihood that the alleged misconduct affected the jury's verdict thereby depriving the defendant of a fair trial.[77] Moreover, the resolution of this issue is within the sound discretion of the trial court.[78]

The record shows that the deputy prosecutor's argument to the jury at the penalty phase of the case was well within

---

[73]*See generally Campbell,* at 30, 41.

[74]*State v. Harvey,* 34 Wn. App. 737, 739, 664 P.2d 1281 (1983).

[75]*State v. Knapp,* 14 Wn. App. 101, 110–11, 540 P.2d 898 (1975); *State v. Walton,* 5 Wn. App. 150, 151–52, 486 P.2d 1118 (1971).

[76]*State v. Davenport,* 100 Wn.2d 757, 760–61, 675 P.2d 1213 (1984).

[77]*Harvey,* at 740.

[78]*Harvey,* at 740.

the bounds of judicial advocacy. In his opening statement, the deputy prosecutor outlined his role and how it differed from that which he had at the guilt phase of the trial. Then during closing argument, the deputy prosecutor summarized. We have carefully perused the closing arguments. The deputy prosecutor did not misinform the jury on the burden of proof as the defendant now claims.[79] When read in the context of the argument, contrary to defendant's assertions on appeal, the deputy prosecutor did not personally vouch for the credibility of witnesses, assert his personal opinion on the death penalty, appeal to the jury's passion and sympathy for the victims and their families, or mislead the jury as to the law.

Specifically, defendant argues that "[t]he prosecutor's statements and argument to the jury constitute improper comment on [the defendant's] failure to testify . . ." When read in context, this is not so. In the penalty phase of the trial, the court's instructions to the jury included the following:

> The evidence you are to consider consists of testimony of the witnesses and the exhibits admitted into evidence, in phase one of this trial and during this special sentencing proceeding.[80]

The defendant testified at the guilt phase of the trial, and at some length, and that testimony was, therefore, before the jury at the penalty phase. As defense counsel argued at the penalty phase, "Mr. Mak got on the stand, he told you about his background." The jury at the penalty phase was thus fully entitled to consider the defendant's testimony at the guilt phase of the trial in mitigation of his act; similarly, the deputy prosecutor was entitled to argue that the evidence was insufficient to merit leniency. Indeed, that was the issue.

Defendant has shown no improper comments in the deputy prosecutor's closing argument or any prejudice resulting

---

[79]*See Davenport*, at 760–61.

[80]Court's instruction 1 (sentencing phase).

therefrom.[81]

ISSUE SEVENTEEN. Was the defendant denied his right to allocution afforded by former CrR 7.1(a) at the penalty phase of the trial?

CONCLUSION. The right of allocution was not denied.

At the time this case was tried, CrR 7.1(a) read in pertinent part:

> Sentence shall be imposed or an order deferring sentence shall be entered without unreasonable delay. Pending such action the court may release or commit the defendant, pursuant to CrR 3.2. Before disposition the court shall afford counsel an opportunity to speak and shall ask the defendant if he wishes to make a statement in his own behalf and to present any information in mitigation of punishment.

The rule has since been amended.[82] The provisions of that former rule were mandatory, and the trial court was required to give the defendant an opportunity to speak "immediately prior to the imposition of sentence".[83] Under this rule as it was at the time of trial, a defendant had the right: (1) to make a statement in his or her own behalf; and (2) to present any information in mitigation of punishment.[84]

The capital punishment statutes, in turn, provide as follows:

> At the special sentencing proceeding both the prosecution and defense shall be allowed to make an opening statement. The prosecution shall first present evidence and then the defense may present evidence. Rebuttal evidence may be presented by each side. Upon conclusion of the evidence, the court shall instruct the jury and then the prosecution and defense shall be permitted to present

---

[81]*See Harvey*, at 740.

[82]The amendments to former rule CrR 7.1 were effective July 1, 1984. *See* 101 Wn.2d 1113, 1115; CrR 7.1, CrR 7.2 and comments thereto.

[83]*State v. Happy*, 94 Wn.2d 791, 792, 620 P.2d 97 (1980).

[84]*Happy*, at 793.

argument. The prosecution shall open and conclude the argument.

RCW 10.95.060(2).

During the penalty phase of the trial, the trial court ruled that the defendant could personally make an unsworn statement to the jury prior to closing arguments to the jury. Then later, at the time the trial court actually pronounced sentence, the trial court also invited the defendant to speak on his own behalf. On both occasions the defendant declined to speak.

From the colloquy between the trial court and both counsel, it appears that what the defendant was apparently seeking was the right, at the end of the penalty phase of the trial, to present evidence on the issue before the jury which would be uncross-examined, unsworn, unrebuttable and unanswerable by argument. Nothing in the statute[85] contemplates or permits that, nor does our former allocution rule.[86] The defendant was given his right to speak to the jury at the sentencing hearing without being required to take an oath, and was again given the right to speak to the trial court before sentence was actually imposed. There was no denial of the defendant's right to allocution.

ISSUE EIGHTEEN. Did the trial court err in allowing a deputy prosecuting attorney to make an opening statement to the jury at the penalty phase of the trial?

CONCLUSION. The trial court followed the statute (RCW 10.95.060(2)) when it allowed both the prosecution and the defense to make opening statements at the outset of the penalty phase of the case. This was completely proper.

The defendant assigns error to the trial court's ruling permitting the prosecution to make an opening statement at the penalty phase of the trial. The trial court made no "ruling" as such. Since a statute specifically prescribes that "[a]t the special sentencing proceeding both the prosecu-

---

[85]RCW 10.95.060(2).

[86]Former CrR 7.1(a). See footnote 82.

tion and defense shall be allowed to make an opening statement",[87] the trial court simply permitted counsel to do so. At the trial no objection to this was voiced.

As this court recently held in *State v. Campbell*, 103 Wn.2d 1, 15–16, 691 P.2d 929 (1984), *cert. denied*, ___ U.S. ___, 85 L. Ed. 2d 526, 105 S. Ct. 2169 (1985), also a capital case, "[a] prosecutor's opening statement should be confined to a brief statement of the issues of the case, an outline of the anticipated material evidence, and reasonable inferences to be drawn therefrom." The deputy prosecuting attorney's short penalty phase opening statement conformed to this admonition. There was no error in this regard.

The defendant argues, in effect, that when the State informed the court it did not plan to present additional evidence at the penalty phase of the trial this somehow changed these principles. This is incorrect. As discussed above, the special sentencing statutes provide that the same jury which hears the guilt phase of the case will also hear the penalty phase unless jury trial is waived or unless unforeseen circumstances necessitate the impaneling of a new jury.[88] Further, if a new jury must for some reason be impaneled, both parties may then introduce evidence concerning the facts and circumstances of the murder before the new jury.[89] These statutes thus contemplate that evidence from the guilt phase of the case will be considered at the penalty phase.[90] The State had a right to proceed as it did. Neither party was obligated to present additional evidence unless that party desired to do so. The State did

---

[87]RCW 10.95.060(2) (part).

[88]RCW 10.95.050(3).

[89]RCW 10.95.060(3).

[90]*State v. Campbell*, 103 Wn.2d 1, 39, 691 P.2d 929 (1984) (Rosellini, J., concurring), *cert. denied*, ___ U.S. ___, 85 L. Ed. 2d 526, 105 S. Ct. 2169 (1985). *Accord, State v. Bartholomew*, 101 Wn.2d 631, 643, 683 P.2d 1079 (1984) (*Bartholomew* II).

not present evidence at the penalty phase, and the defendant did. That was fully appropriate.

ISSUE NINETEEN. Did the defendant receive effective assistance of counsel during the penalty phase of the trial?

CONCLUSION. Considering the entire record, the defendant was afforded effective assistance of counsel throughout the trial.

The test for whether a criminal defendant was denied effective assistance of counsel is if, after considering the *entire record,* it can be said that the accused was afforded *effective representation* and a *fair* and *impartial* trial.[91] Under this standard the defendant is not guaranteed *successful* assistance of counsel.[92] To establish ineffective assistance of counsel, defendant bears the burden of proving two things: First, considering the entire record, that he or she was denied effective representation, and second, that he or she was prejudiced by such ineffectiveness.[93] If defense counsel's trial conduct can be characterized as legitimate trial strategy or tactics, then it cannot serve as a basis for a claim that the defendant did not receive effective assistance of counsel.[94]

In the case before us, the defendant alleges numerous instances which he now claims amount to the denial of effective assistance of counsel. He claims that trial counsel was ineffective because: (1) counsel failed to take exception to the trial court's penalty phase instruction relating to the State's burden of proof (see Issue 26); (2) counsel failed to object to the trial court not giving an instruction on the presumption of mitigation and failed to propose such an

---

[91]*State v. Thomas,* 71 Wn.2d 470, 471, 429 P.2d 231 (1967); *State v. Bradbury,* 38 Wn. App. 367, 370, 685 P.2d 623 (1984).

[92]*State v. Adams,* 91 Wn.2d 86, 90, 586 P.2d 1168 (1978); *State v. White,* 81 Wn.2d 223, 225, 500 P.2d 1242 (1972).

[93]*State v. Jury,* 19 Wn. App. 256, 262–63, 576 P.2d 1302 (1978); *see Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052 (1984).

[94]*Adams,* at 90.

instruction (see Issue 27); (3) counsel failed to object to the trial court not instructing the jury that it was not to consider the fact that the defendant did not testify at the special sentencing proceeding and failed to propose such an instruction (see Issue 28); and (4) counsel failed to propose an instruction stating that it is appropriate for the jury to consider sympathy in determining whether the defendant should receive the death sentence (see Issue 24).

We have carefully reviewed these claims. Considering the trial court's instructions as a whole, as we must, we conclude that they properly informed the jury of the law and that they also permitted the defendant to fully argue his theory of the case.[95] The defendant has failed to meet the first prong of his burden of proof—that he was denied effective representation.[96]

Continuing with the defendant's claims in this regard he contends that (5) he did not receive effective representation because trial counsel failed to request dismissal of the death penalty notice after learning that the State was not going to present further evidence at the penalty phase of the case. For the reasons stated in our discussion of the previous issue (Issue 18), the State had the right to proceed as it did; therefore, this claim is nonmeritorious.

The defendant further argues (6) that trial counsel failed to present to the jury that the defendant was a poorly educated immigrant. Contrary to defendant's present assertion, the record shows that at the guilt phase of the trial defense counsel did present such testimony, and that the jury was instructed at the penalty phase that it could consider it.[97] Furthermore, defense counsel did argue this point to the jury in his closing argument at the close of the special sentencing proceeding, one such example being as follows:

---

[95]*See State v. Jeffries,* 105 Wn.2d 398, 717 P.2d 722 (1986); *State v. Johnson,* 29 Wn. App. 807, 811–12, 631 P.2d 413 (1981).

[96]*Jury,* at 262–63.

[97]Court's instruction 1 (sentencing phase).

[DEFENSE COUNSEL:] Mr. Mak got on the stand, he told you about his background. Doesn't sound good. It is a black mark on all of us. A young immigrant came to this country, couldn't speak English very well, never got assimilated . . .

Finally, defendant contends that (7) trial defense counsel failed to request "a substantial recess" between the guilt and penalty phases of the trial. This, in turn, he argues, resulted in an unfair disposition. We do not agree.

The guilt phase of the case concluded with the return of a guilty verdict during the noon hour. The trial court asked counsel if it was agreeable to begin the sentencing phase of the case at 3 p.m. Both counsel said it was. Nothing in the record suggests that both counsel were not ready by that time or that defense counsel was not as fully prepared then as he would have been later. Furthermore, defendant's present argument in this regard disregards the statutory admonition that the special sentencing proceeding

> *shall commence as soon as practicable* after completion of the trial at which the defendant's guilt was determined.

(Italics ours.) RCW 10.95.050(3) (part).

The defendant has failed to meet his burden of showing that trial defense counsel made errors that deprived the defendant of effective assistance of counsel which, in turn, deprived him of a fair trial—let alone that he was prejudiced thereby.[98]

ISSUE TWENTY. Did the trial court commit reversible error by failing, at the guilt phase of the trial, to instruct the jury as to the requirement of jury unanimity?

CONCLUSION. Through neglect or error on the part of the court or staff, the final paragraph was inadvertently omitted from the concluding instruction. This did not result in instructional error, however, because other instructions adequately covered the matter of jury unanimity. Furthermore, any question on the matter was conclusively dispelled

---

[98]*See State v. Thomas, supra; State v. Jury, supra.*

by the polling of the jury.

Defendant alleges, and the State concedes, that the omission of the last page of the concluding instruction to the jury (instruction 15), in the filed set of Court's Instructions to the Jury (guilt phase), was a result of neglect or error on the part of the trial court.

The State argues, nonetheless, that the trial court personally read the final page of the concluding instruction to the jury from its own set of instructions and that "[i]t is difficult to imagine that nobody would have detected such a glaring omission in a stock instruction which is given at the close of every case." It is clear that no exception was taken to the giving of this instruction. The defendant, on the other hand, argues that this error requires reversal because the final page was the one containing the instruction on unanimity in the verdict.

The State had proposed that a concluding instruction be given at the guilt phase of the trial, the final paragraph of which read as follows:[99]

> *Since this is a criminal case, all twelve of you must agree for you to return a verdict.* When all of you have so agreed, fill in the proper form of verdict to express your decision. The foreman will sign it and notify the bailiff who will conduct you into court to declare your verdict.

(Italics ours.) The defendant did not propose a concluding instruction. The instruction proposed by the State was the pattern Basic Concluding Instruction[100] modified to fit this kind of case. Such an instruction, or its equivalent, is indeed "stock" instructional language given in jury trials of criminal cases.

The problem is that the final paragraph of the proposed concluding instruction is missing from the trial court's guilt phase instructions contained in the clerk's papers. This missing final paragraph is the one containing the above

---

[99]State's proposed instruction 13 (guilt phase).

[100]WPIC 155.01.

italicized language. The trial court's reading of the instructions to the jury from the bench is not contained in the verbatim report of proceedings, presumably because the court reporter did not report it. In short, based on the appellate record presented to us by the parties, it is not possible to determine if the missing final paragraph was or was not actually read to the jury by the trial court. That being so, and because the trial judge signed the guilt phase instructions at the bottom of the 1–page conclusion instruction, we must assume that the above quoted final paragraph of the concluding instruction was not read to the jury or otherwise given to it.

■■■ The law of this state is settled: "[i]n Washington, a defendant may be convicted *only* when a unanimous jury concludes that the criminal act charged in the information has been committed." (Italics ours.)[101] A careful reading of the other instructions that were given show that they sufficiently instructed the jury on this point. By the aggravated murder in the first degree "to convict" instruction, the jury was specifically instructed:[102]

> In other words, *you must all agree* which, if any, of these elements has been proved beyond a reasonable doubt.

(Italics ours.) This sufficiently instructed the jurors as to their duty to unanimously agree on the guilt phase general and special verdicts. Furthermore, the jury was additionally instructed with reference to the guilt phase special verdict as follows:[103]

> If you find the defendant guilty of aggravated first degree murder, indicate on the special verdict form which of the aggravating circumstances *that you have unanimously found* to exist beyond a reasonable doubt.

■■■ Nor is that the end of our inquiry on this issue. On

---

[101]*State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984).

[102]Court's instruction 7 (guilt phase (part)). The full text of instruction 7 is set out in connection with our discussion of Issue 21.

[103]Court's instruction 15 (guilt phase (part)).

point is this court's decision in *State v. Mickens,* 61 Wn.2d 83, 377 P.2d 240 (1962). There, the instruction stating the requirement of a unanimous verdict was also omitted. It, too, was a criminal case involving a single defendant. The court affirmed the conviction, however, holding that

since the jury was polled, there is no doubt that the verdict *was* unanimous and *was* the result of each juror's individual determination.

*Mickens,* at 87. Here, too, a minute entry in the journal establishes that when the jury returned its general and special verdicts to the court, the verdicts were read aloud in their entirety. Then, immediately following such reading, the individual jurors were polled in open court. Each juror affirmed that each of the verdicts was his or her individual verdict and the verdict of the jury. That minute entry on the polling reads:

By direction of the Court the jury is polled. Twelve jurors answer these are their individual verdicts and the verdicts of the jury. The verdicts are filed and the jury is retired to the jury room.

The polling of the jury was reported, transcribed and also made a part of the record herein. It fully verifies the minute entry. "The polling of the jury is for the purpose of determining that the verdict signed by the foreman is that of the individual jurors . . ."[104] It is our holding here that the polling of the jury established that the omission from the concluding instruction did not affect the final outcome of the case, thus was no more than harmless error in any event.[105]

*State v. Badda,* 63 Wn.2d 176, 385 P.2d 859 (1963), cited by the defendant, does not hold contrary to *Mickens;* indeed, it cites and quotes *Mickens* with approval. *Badda* simply holds that under the facts of that case, *which involved two defendants,* the court could not conclude from

---

[104]*State v. Agtuca,* 12 Wn. App. 402, 406, 529 P.2d 1159 (1974).

[105]*State v. Mickens,* 61 Wn.2d 83, 87, 377 P.2d 240 (1962). *See State v. Wanrow,* 88 Wn.2d 221, 237, 559 P.2d 548 (1977).

the record that there was a "total concurrence of all jurors".

For the reasons set forth above, we have no doubt that in this case all 12 jurors concurred on both the general and special verdicts returned at the conclusion of the guilt phase of the case.

ISSUE TWENTY–ONE. Did the trial court err in the guilt phase of the case by submitting a single special verdict form to the jury on the "aggravating circumstances" issue for all 13 counts of aggravated murder in the first degree?

CONCLUSION. As discussed under Issue 20, two instructions informed the jury that the jurors had to be unanimous as to the presence of any aggravating circumstance with respect to each of the 13 counts. The trial court did not abuse its discretion by submitting one special verdict form for all 13 counts.

At the close of the guilt phase of the case, the trial court submitted to the jury only one special verdict form on aggravating circumstances for all 13 counts of aggravated murder in the first degree. It was not excepted to. That verdict form, with the jury's responses thereto, is as follows:

> We, the jury, find that the State has proved beyond a reasonable doubt that the following aggravating circumstance(s) exist as to counts I through XIII:
>
> yes (a) The defendant and his accomplices
> (yes or no) committed the murder to conceal the
> commission of a crime or to protect or
> conceal the identity of any person com-
> mitting a crime;
>
> no (b) There was more than one victim and
> (yes or no) the murders were part of a common
> scheme or plan of the defendant;
>
> yes (c) The murder was committed in the
> (yes or no) course of or furtherance of a robbery.

The defendant claims that since this special verdict form did not provide a separate special finding on each count, it is impossible to determine whether the jury decided that either one or both of the aggravating circumstances found were proved in each of the counts. Thus, he argues, the

jury's special verdict does not show that its decision was unanimous on the aggravating factors as to all 13 counts.

As this court recently held in *State v. Bartholomew,* 98 Wn.2d 173, 192 n.2, 654 P.2d 1170 (1982), *State's cert. granted,* 463 U.S. 1203, 77 L. Ed. 2d 1383, 103 S. Ct. 3530, *defendant's cert. denied,* 463 U.S. 1212, 77 L. Ed. 2d 1395, 103 S. Ct. 3548 (1983) (*Bartholomew* I),

> in order that a death sentence be rationally reviewable it must at least be possible for a reviewing court to determine which of the 10 statutory aggravating factors were found proved beyond a reasonable doubt. *If more than one aggravating factor is put before the jury, . . . the jury must be requested to specify which aggravating factors it found proved beyond a reasonable doubt.*

(Italics ours.)

At the guilt phase of the trial, the trial court gave instruction 5, listing the name of the victim alleged in each count. Then it gave the following "to convict" instruction setting out the elements of the offense:[106]

### Instruction No. 7

To convict the defendant Kwan Fai Mak of the crime of aggravated murder in the first degree, *as charged in any count,* each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about the 19th day of February, 1983, the defendant or an accomplice caused the death of the individual named;

(2) That the defendant acted with the intent to cause the death;

(3) That the defendant acted with premeditated intent to cause the death;

(4) That the death was a result of the acts of the defendant or his accomplice;

(5) That one or more of the following aggravating factors was present:

(a) The defendant and his accomplice committed the murder to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime, OR

---

[106]Court's instruction 7 (guilt phase).

(b) There was more than one victim and the murders were part of a common scheme or plan of the defendant, OR

(c) The murder was committed in the course of or in furtherance of the crime of robbery;

(6) That the acts occurred in King County, Washington.

*If you find from the evidence that elements (1), (2), (3), (4), (6), and either (5)(a), (5)(b), or (5)(c) have been proved beyond a reasonable doubt as to any count, then it will be your duty to return a verdict of guilty as to that count.* Elements (5)(a), (5)(b) and (5)(c) are alternatives and only one need be proved. *You must, however, agree unanimously that (5)(a) has been proved, or that (5)(b) has been proved, or that (5)(c) has been proved. In other words, you must all agree which, if any, of these elements has been proved beyond a reasonable doubt.*

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty as to the charge of aggravated first degree murder as to that count.

(Italics ours.)

 Our reading of this instruction establishes that the jury *was* informed that the jurors had to be unanimous as to the presence of the aggravating factors found in connection with each of the 13 counts. As discussed under Issue 20, the concluding instruction (instruction 15) also told them this. The special verdict form, when completed by the jury, indicated which of the aggravating circumstances the jury unanimously found in reaching its verdict of guilty on all counts. This met the requirement of *Bartholomew* I. We also observe that at the trial of the case no issue was raised, or evidence presented, to indicate other than that the aggravating circumstances alleged were the same with respect to one and all of the victims. We perceive no error in this regard.

ISSUE TWENTY–TWO. Did the trial court err by instructing the jury that the defendant could be convicted of aggravated murder in the first degree based on an accomplice theory?

CONCLUSION. The trial court did not err in its accomplice instructions. It *did* instruct on accomplice principles in connection with the aggravated murder in the first degree elements that constitute premeditated first degree murder, and that was proper. In that part of the aggravated murder in the first degree instructions pertaining to the aggravating factors, however, the trial court's instructions did *not* allow the defendant's sentence to be enhanced on the basis of accomplice principles.

In the interest of clarity, we again quote that part of the "to convict" instruction which sets out the elements of the crime of aggravated murder in the first degree, this time, however, with the accomplice portions thereof italicized:[107]

Instruction No. 7

To convict the defendant Kwan Fai Mak of the crime of aggravated murder in the first degree, as charged in any count, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about the 19th day of February, 1983, the defendant *or an accomplice* caused the death of the individual named;

(2) That the defendant acted with the intent to cause the death;

(3) That the defendant acted with premeditated intent to cause the death;

(4) That the death was a result of the acts of the defendant *or his accomplice*;

(5) That one or more of the following aggravating factors was present:

(a) The defendant *and his accomplice* committed the murder to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime, OR

(b) There was more than one victim and the murders were part of a common scheme or plan of the defendant, OR

(c) The murder was committed in the course of or in furtherance of the crime of robbery;

(6) That the acts occurred in King County, Washington.

---

[107]Court's instruction 7 (guilt phase).

(Italics ours.) By special verdict, the jury found the existence of two of the three aggravating factors alleged in this case, namely, those specified in paragraphs 5(a) and 5(c) of the above instruction.

As we recently observed in *State v. Kincaid,* 103 Wn.2d 304, 312, 692 P.2d 823 (1985), "[c]onceptually, the crime is premeditated murder in the first degree with aggravating circumstances. Commonly, however, the crime is often referred to by the courts and others as 'aggravated first degree murder'." We then continued on to explain:

> A statutory aggravating circumstance relates to the crime of premeditated murder in the first degree as a defendant being armed with a deadly weapon relates to the commission of certain felonies while so armed. In the statutory framework in which the statutory aggravating circumstances now exist, they are not elements of a crime but are "aggravation of penalty" provisions which provide for an increased penalty where the circumstances of the crime aggravate the gravity of the offense. The crime for which the defendant was tried and convicted in connection with the death of his wife was premeditated murder in the first degree, and the jury was correctly instructed as to the elements of that offense. The penalty for that murder was properly enhanced to life imprisonment without possibility of parole when the jury unanimously found by a special verdict that the existence of a statutory aggravating circumstance had been proved by the State beyond a reasonable doubt.

(Footnotes omitted.) *Kincaid,* at 312.

Thus, the first four elements of the aggravated murder in the first degree "to convict" instruction, set forth above, state the elements of the substantive crime of premeditated murder in the first degree. Then the fifth element sets out the alleged "aggravation of penalty" provisions which, when one or more is found, increase the penalty to mandatory life, or death, depending on the determination made in the capital sentencing phase of the case where, as here, the prosecutor has sought the death penalty. The death penalty had not been sought in *Kincaid.* In *Kincaid,* a separate instruction on the alleged aggravating factors was given by

the trial court, whereas here, as can be seen from the above instruction, the trial court included the aggravating factors as an element of the offense (element 5). That was not inappropriate for, as we also pointed out in *Kincaid*:

> *Nor is it our intention to hold herein that referring to this crime in instructions as the crime of "aggravated murder in the first degree", and including any alleged aggravating circumstance as an element of the offense, would be error.* While the manner in which the trial court structured its instructions to the jury in this case may conceptually be the preferred manner, it is not the only way that a jury may be properly instructed on the matter.

(Italics ours.) *Kincaid*, at 313.

In the present case, the trial court also gave the following instruction on accomplice (complicity) liability:[108]

### Instruction No. 10

A person who is an accomplice in the commission of a crime is guilty of that crime.

A person is an accomplice in the commission of a crime, if, with knowledge that it will promote or facilitate the commission of the crime, he either:

(1) solicits, commands, encourages, or requests another person to commit the crime; or

(2) aids or agrees to aid another person in planning or committing the crime.

The word "aid" means all assistance whether given by words, acts, encouragement, support or presence. Mere presence and knowledge of the criminal activity of another are not enough to establish that a person is an accomplice and has the necessary intent for the crime charged. A person who is present at the scene and is ready to assist by his presence is aiding in the commission of the crime.[109]

This instruction was not excepted to.

What the defendant seems to be arguing here, based on principles of statutory construction and accomplice liability, is as follows: the only way the defendant could be con-

---

[108]Court's instruction 10 (guilt phase).

[109]*See* WPIC 10.51.

victed of aggravated murder in the first degree (for which the death penalty may be imposed) is if the State proved beyond a reasonable doubt: (1) that the defendant was in fact the shooter (and the prosecutor concedes that the evidence in this regard is conflicting); or (2) that as an accomplice to Benjamin Ng (who clearly did at least some of the shooting), the defendant knew Benjamin Ng was armed and shared Benjamin Ng's intent to commit the crime and his purpose in committing the aggravating factors when they went into the Wah Mee Club together (and which intent and purpose the defendant by his testimony denied). Defendant Mak further argues that the above instructions to the jury did not so require, and that his convictions, therefore, should be reversed.

The legal syllogism on which this argument is predicated seems to be basically as follows:

(a) The accomplice (complicity) statute found in the Washington Criminal Code (RCW 9A.08.020(1)) relates only to "crimes" contained in that Code. *State v. McKim*, 98 Wn.2d 111, 653 P.2d 1040 (1982). *See State v. Davis*, 101 Wn.2d 654, 682 P.2d 883 (1984).

(b) The statutory aggravating factors which were used in this case to enhance premeditated murder in the first degree to aggravated murder in the first degree are not "crimes" in the Washington Criminal Code, RCW Title 9A, but are sentence enhancement factors contained in RCW Title 10. *Kincaid,* at 312–13.

(c) The trial court's instructions 7 and 10, quoted above, allowed the jury to enhance the defendant's sentence to aggravated murder on an accomplice liability theory.

(d) Therefore, as this syllogism goes, it must follow that this was reversible error inasmuch as the jury was not instructed that the defendant had to be found to have shared Benjamin Ng's intent to commit the crimes and his purpose in committing the aggravating factors before he could be convicted. *See State v. McKim, supra.*

As previously discussed, paragraphs 1 through 4 of instruction 7, above, set out the elements of premeditated

murder in the first degree.[110] Thus the State was required to prove that the defendant acted with the intent to cause each victim's death and that his intent was premeditated. These first four paragraphs also required the State to prove that "the defendant *or* an accomplice" (italics ours) caused the deaths. This is in accord with the accomplice principles stated in instruction 10, above, and with the established accomplice law of this state. RCW 9A.08.020; *State v. Davis, supra.* Premeditated murder in the first degree is a statute found in the Washington Criminal Code, RCW 9A.32.030(1)(a), and the complicity statute is, therefore, expressly applicable to that crime, RCW 9A.04.090. Furthermore, exception was not taken to instruction 7.

Turning to paragraph 5 of instruction 7, above, which specifies the alleged aggravating circumstances that serve as "sentence enhancement factors" with reference to the punishment, it will be seen that the only reference to "accomplice" contained in that paragraph is to the requirement that the jury find "the defendant *and* his accomplice" (italics ours) committed the murder to conceal the commission of the crime or to protect their identities. If this paragraph had referred to "the defendant *or* his accomplice," we would be required to deal with the rest of the defendant's theory, but since it does not, we need not address it. Since the jury had to find that "the defendant *and* his accomplice" committed the murder to conceal the crime or their identities, the finding of this aggravating factor was *not* predicated on accomplice liability. This issue does not arise at all in connection with the other aggravating factor found by the jury, *i.e.,* murder committed during the course of a robbery, since the word "accomplice" was not used in that part of the instruction (instruction 7, para. 5(c)).

Thus, we are not required in this case to address situations such as that presented in *Enmund v. Florida,* 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982), but note of *Enmund* is required to illustrate the distinction we draw

---

[110]RCW 9A.32.030(1)(a); *see* WPIC 26.02.

here. In *Enmund* a death sentence was reversed on the basis of the Eighth Amendment and the Fourteenth Amendment because the death sentence was based on the defendant's conviction of felony murder. In that case, Enmund was the getaway car driver for two robbers. He sat in the parked car outside a house awaiting their return. They killed two victims during the course of the robbery. The killings were not planned and Enmund did not personally participate in any way and there was no finding he intended to kill. In the State of Washington, felony murder (although it is murder in the first degree) cannot be the predicate upon which a charge of aggravated murder in the first degree is based; the only proper predicate is premeditated murder in the first degree. *Kincaid,* at 307; *Enmund,* at 789 n.6. Further, as discussed above, the jury by its guilty verdict in this case found that the defendant Mak did have a premeditated intent to kill.

ISSUE TWENTY–THREE. Did the trial court err at the guilt phase of the case by not instructing the jury on the "lesser included offense" of premeditated murder in the first degree?

CONCLUSION. A trial court does not commit error by not giving an included offense instruction that was never requested by the defendant, and which would have conflicted with the defendant's theory of the case had it been given.

The defendant assigns error to the trial court's failure to instruct the jury on the lesser included offense of premeditated first degree murder as defined by RCW 9A.32.030-(1)(a). This was not error because not only was no such instruction requested by the defendant,[111] but had the trial court given such an instruction sua sponte, it would have been in direct conflict with the defendant's theory of the case.

It was the defendant's theory at trial that, while he had

---

[111]*State v. Dowell,* 26 Wn. App. 629, 631, 613 P.2d 197 (1980); *State v. Walker,* 13 Wn. App. 545, 550, 536 P.2d 657 (1975).

no intent to kill, he did go to the Wah Mee Club on the night of the crime, was armed with a gun at the time and did take personal property from a person by force or fear— and that after he left the premises, one or both of his two companions (Benjamin Ng and Tony Ng) killed the victims. Defense counsel clearly so stated in his opening statement at the guilt phase of the case; the defendant so testified; and defense counsel so argued to the jury at the conclusion of the guilt phase of the case.

The trial court gave the following instruction explaining "included offense":[112]

### No. 6.

If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, the defendant may be found guilty of any lesser crime, the commission of which is necessarily included in the crime charged, if the evidence is sufficient to establish the defendant's guilty of such lesser crime beyond a reasonable doubt.

*The crime of aggravated murder in the first degree necessarily includes the lesser crime of murder in the first degree.*

When a crime has been proven against a person and there exists a reasonable doubt as to which of two or more degrees that person is guilty, he shall be convicted only of the lowest degree.

(Italics ours.) The italicized portion of this instruction is identical to language from a similar instruction on the subject proposed by the defendant.

The foregoing instruction was followed by the aggravated murder in the first degree "to convict" instruction (instruction 7) which was, in turn, followed by this felony murder "to convict" instruction:[113]

### No. 8.

To convict the defendant Kwan Fai Mak of the crime of murder in the first degree, as charged in any count,

---

[112]Court's instruction 6 (guilt phase). This is WPIC 4.11.

[113]Court's instruction 8 (guilt phase). This is WPIC 26.04.

each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about the 19th day of February, 1983, the individual named was killed;

(2) That the defendant was committing robbery in the first degree;

(3) That the defendant or another participant caused the death in the course of and in furtherance of such crime or in immediate flight from such crime;

(4) That the deceased was not a participant in the crime; and

(5) That the acts which caused the death of the decedent occurred in King County, Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt as to any count, then it will be your duty to return a verdict of guilty as to that count.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements as to any count, then it will be your duty to return a verdict of not guilty as to that count.

No exception was taken to the instructions just quoted.

The defendant now argues that it was reversible error not to have given an instruction on the "lesser included offense" of premeditated murder in the first degree.[114] He cites *State v. Workman,* 90 Wn.2d 443, 584 P.2d 382 (1978) and *State v. Parker,* 102 Wn.2d 161, 683 P.2d 189 (1984) for the proposition that it is prejudicial error to not give a lesser included offense instruction when there is evidence to support it. Even assuming that, however, it still did not constitute reversible error for the trial court not to give an instruction on an included offense that (a) was never requested and (b) did not accord with the defendant's theory of the case put forth at the trial by counsel based on the defendant's own testimony. In both *Workman* and *Parker,* the lesser included offense instruction in question was requested; here it was not.

In his closing argument at the guilt phase, trial counsel for the defendant argued that "the facts clearly indicate

---

[114]RCW 9A.32.030(1)(a).

felony murder with regard to Mr. Mak." And further:

> Even though he did not have any part in taking the money, even though he himself did not take the guns from the two people, he still was there when the guns were taken, he took the personal property, theft from another, his accomplice used force, he's guilty of robbery, a murder resulted, people got shot, he's guilty of murder in the first degree. But he's not guilty of aggravated murder. He had no intent, no premeditated intent to cause the death.

The deputy prosecutor argued just the opposite:

> This was not a first degree murder, this was an aggravated first degree murder or it's nothing.

The defendant testified clearly and unequivocally that he had committed felony murder. His lawyer argued with equal clarity and unequivocation that the defendant had committed felony murder; this was by way of an attempt to save the defendant from paying for his crimes with the death penalty. Neither felony murder nor premeditated first degree murder are capital offenses in this state—nor are they punishable by mandatory life imprisonment.[115] Thus, the defendant's conviction of either premeditated first degree murder or felony murder would have had the same effect, avoidance of the death penalty and preservation of the possibility of parole.

 Under these circumstances, we hold that: (1) the lesser included offense instruction that was given, not having been excepted to at trial, became the law of the case;[116] (2) any error in connection therewith was invited error and cannot be complained of on appeal;[117] and (3) any error in

---

[115]See *Kincaid,* at 310.

[116]*State v. Louie,* 68 Wn.2d 304, 312, 413 P.2d 7 (1966), *cert. denied,* 386 U.S. 1042, 18 L. Ed. 2d 610, 87 S. Ct. 1501 (1967); *State v. Byrd,* 25 Wn. App. 282, 287, 607 P.2d 321 (1980).

[117]*State v. Pam,* 101 Wn.2d 507, 511, 680 P.2d 762 (1984); *State v. Kincaid,* 103 Wn.2d 304, 314–15, 692 P.2d 823 (1985).

that connection was harmless beyond a reasonable doubt.[118] If error at all, it clearly was not reversible error.

The defendant also argues that since felony murder requires proof that the crime was committed "in the course of *and* in furtherance of" the felony,[119] it was not properly an "included offense" of aggravated first degree murder at all, thus, the trial court also erred on this basis when it gave the felony murder included offense instruction. Even accepting defendant's present premise that it was error to give the felony murder included offense instruction, for each and all of the same three reasons just stated, it was not reversible error.

Issues Twenty–Four through Thirty–Three. The defendant presents a broad array of further penalty phase instructions which he now feels should have been given, and instructions that were given but which he now feels should not have been given, thus raising the question whether any of these, or all of them together, amount to reversible error?

Conclusion. None of the instructions defendant now argues should have been given were proposed at trial as they must have been to preserve any claimed error, and no exceptions were taken to those instructions which were given as is necessary to preserve any claimed error as to them. This being a capital case, and since some of the arguments allege constitutional error, we have nonetheless reviewed these claims.[120] We have evaluated them considering the totality of the circumstances, including the instructions given to the jury, the arguments of counsel, the weight of the evidence and other relevant factors. We conclude

---

[118]*State v. Burri,* 87 Wn.2d 175, 182, 550 P.2d 507 (1976). *See Chapman v. California,* 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065, *reh'g denied,* 386 U.S. 987, 18 L. Ed. 2d 241, 87 S. Ct. 1283 (1967); *State v. Johnson,* 71 Wn.2d 239, 244–45, 427 P.2d 705 (1967).

[119]*See* RCW 9A.32.030(1)(c).

[120]*See State v. Griffith,* 52 Wn.2d 721, 732, 328 P.2d 897 (1958); RAP 2.5.

therefrom that the defendant did receive a constitutionally fair trial[121] and that there is no reversible error with respect to these assignments of error, whether considered individually or collectively.

It is necessary to an understanding of the numerous and sometimes intricately argued issues raised in this connection, that the full text of the instructions given to the jury at the close of the penalty phase of the case be set out. These were as follows:

It is your duty to determine the facts in this case from the evidence produced in court. It also is your duty to accept the law from the court, regardless of what you personally believe the law is or ought to be. You are to apply the law to the facts and in this way decide the case.

The order in which these instructions are given has no significance as to their relative importance. The attorneys may properly discuss any specific instructions they think are particularly significant. You should consider the instructions as a whole and should not place undue emphasis on any particular instruction or part thereof.

The evidence you are to consider consists of the testimony of the witnesses and the exhibits admitted into evidence, in phase one of this trial and during this special sentencing hearing. It has been my duty to rule on the admissibility of evidence. You must not concern yourselves with the reasons for these rulings. You will disregard any evidence which either was not admitted or which was stricken by the court.

In determining whether any proposition has been proved, you should consider all of the evidence introduced by all parties bearing on the question. Every party is entitled to the benefit of the evidence whether produced by that party or by another party.

You are the sole judges of the credibility of the witnesses and of what weight is to be given the testimony of each. In considering the testimony of any witness you make [sic] take into account the opportunity and ability of the witness to observe, the witness' memory and manner while testifying, any interest, bias or prejudice the

---

[121]*See In re Lile,* 100 Wn.2d 224, 228, 668 P.2d 581 (1983); *Kentucky v. Whorton,* 441 U.S. 786, 789, 60 L. Ed. 2d 640, 99 S. Ct. 2088, *reh'g denied,* 444 U.S. 887, 62 L. Ed. 2d 121, 100 S. Ct. 186 (1979).

witness may have, the reasonableness of the testimony of the witness considered in light of all the evidence, and any other factors that bear on believability and weight.

Counsel's remarks, statements and arguments are intended to help you understand the evidence and apply the law. They are not evidence, however, and you should disregard any remark, statement or argument which is not supported by the evidence or the law as given to you by the court.

The lawyers have the right and the duty to make any objections which they deem appropriate. Such objections should not influence you, and you should make no presumption because of objections by counsel.

The law does not permit me to comment on the evidence in any way and I have not intentionally done so. If it appears to you that I have so commented, during either the trial or the giving of these instructions, you must disregard such comment entirely.

Court's instruction 1 (penalty phase).

Jurors should consult with one another and deliberate with a view to reaching a unanimous verdict, if it can be done without violence to individual judgment. Each of you must decide the case for yourself but only after an impartial consideration of the evidence with your fellow jurors. In the course of deliberations, you should not hesitate to re–examine your own views and change your opinion if you are convinced it is erroneous. However, you should not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict.

Court's instruction 2 (penalty phase).

The question you are required to answer is as follows: Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?

If you unanimously answer "yes," the sentence will be death. If you unanimously answer "no," or if you are unable to agree on a unanimous answer, the sentence will be life imprisonment without possibility of parole.

In deciding the question posed, the jury may consider any relevant factors, including but not limited to the fol-

lowing:
 (1) Whether the age of the defendant at the time of the crime calls for leniency;
 (2) Whether the defendant was an accomplice to a murder committed by another person where the defendant's participation in the murder was relatively minor;
 (3) Whether the defendant acted under duress or domination of another person.

Life imprisonment without the possibility of release or parole means that: (1) the individual shall not have his sentence suspended, deferred, or commuted by any judicial officer; (2) the Board of Prison Terms and Paroles or its successor shall never parole the individual or reduce the period of confinement; (3) the person shall not be released as a result of any type of good time calculation; (4) nor shall the Department of Corrections permit the person to participate in any release or furlough program.

Court's instruction 3 (penalty phase).

During this special sentencing proceeding, the State has the burden of convincing you beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency and that the death penalty should therefore be imposed.

A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence. If, after such consideration, you have an abiding belief that there are not sufficient mitigating circumstances to merit leniency, you are satisfied beyond a reasonable doubt.

Court's instruction 4 (penalty phase).

A mitigating circumstance is a fact about either the offense or about the defendant which in fairness or in mercy may be considered as extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense.

The appropriateness of the exercise of mercy is itself a mitigating factor you may consider in determining whether the State has proved beyond a reasonable doubt that the death penalty is warranted.

You are also to consider as mitigating circumstances any other factors concerning the defendant that you find to be relevant.

Court's instruction 5 (penalty phase).

Because you have found the defendant Kwan Fai Mak guilty of aggravated murder, you have been reconvened for this special sentencing proceeding.

It is the foreman's duty to see that discussion is carried on in a sensible and orderly fashion, that the issues submitted for your decision are fully and fairly discussed and that every juror has a chance to be heard and to participate in the deliberations upon each question before the jury.

You will be furnished with all of the exhibits admitted in evidence, these instructions and sentencing verdict form.

You must answer one question. All twelve of you must agree before you answer a question "yes" or "no". When all of you have agreed, fill in the answer to the question in the verdict form to express your decision. When you have filled in the answer called for by the verdict form, the foreman will sign it and notify the bailiff who will conduct you into court to declare your verdict.

You will now listen to the argument of counsel.

/s/ Frank D. Howard
Judge

Court's instruction 6 (penalty phase).

Following is the special verdict returned by the jury following its deliberations at the conclusion of the penalty phase:

As To Counts I–XIII

Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?

Answer:

[x] "Yes" (In which case the defendant shall be sentenced to death)

[ ] "No" (In which case the defendant shall be sentenced to life imprisonment without possibility of parole)

[ ] "UNABLE TO UNANIMOUSLY AGREE" (In which case the defendant shall be sentenced to life imprisonment without possibility of parole)

<u>/s/ [foreman's name]</u>
FOREPERSON

To the extent reasonably possible, we have summarized our decision on each of these claims of instructional error. These are as follows.

<u>Lack of an instruction on "sympathy". (Issue 24).</u>[122] At the outset of the penalty phase, the trial court made it clear to the jury that this was a separate sentencing proceeding. Instruction 5 gave the jury the right to consider "mercy" as well as any other factors it might find relevant. "Mercy" and "sympathy" are both defined in terms of "compassion".[123] The defense had full leeway to argue sympathy and did so.

<u>Lack of an instruction that the death penalty should not be imposed solely to exact retribution or in a spirit of vengeance. (Issue 25).</u> *Hawkins v. Rhay,* 78 Wn.2d 389, 401, 474 P.2d 557 (1970), requiring such an instruction at the retrial of the defendant in that particular case, was decided before the death penalty statutes were enacted in their present form, where there is a separate penalty proceeding and wherein the entire focus of the proceeding is on whether or not there are sufficient mitigating circumstances to merit leniency. Defendant's argument to the contrary notwithstanding, the State did not in this case argue in a spirit of vengeance or seek the death penalty solely to exact retribution.[124] Such complained of statements as "the

---

[122]*See State v. Quinlivan,* 81 Wn.2d 124, 130, 499 P.2d 1268, 72 A.L.R.3d 835 (1972).

[123]*Webster's Third New International Dictionary* 1413, 2317 (1968).

[124]We observe that in *Enmund v. Florida,* 458 U.S. 782, 798, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982), the United States Supreme Court states:

"In *Gregg v. Georgia* [428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976),]

proper punishment for this crime, for this man is the punishment provided by law for this crime, and that is the penalty of death" were not improper argument. Considering the crimes committed, they were mild statements indeed.

■ The use in instruction 4 of "convincing you" instead of "proving to you". (Issue 26). RCW 10.95.060(4) provides:

> Upon conclusion of the evidence and argument at the special sentencing proceeding, the jury shall retire to deliberate upon the following question: "Having in mind the crime of which the defendant has been found guilty, are you *convinced* beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"
>
> In order to return an affirmative answer to the question posed by this subsection, the jury must so find unanimously.

(Italics ours.) The trial court instructed the jury in accordance therewith in its instructions 3 and 4, as well as in the special verdict (which was in the form proposed by the defendant). None of these was excepted to. While expressing the State's burden in terms of "proving" rather than "convincing" is preferable, instructing in the language of a statute is also usually proper.[125] Instructing in the language of the statute was not error in the situation here presented.

Lack of an instruction that sufficient mitigating circumstances to merit leniency are presumed. (Issue 27). Instruction 4 contains the "beyond a reasonable doubt" standard and specifically provides that the State has the burden on the issue before the jury. The language of the special verdict then itself underscores the State's burden in this regard.

The defendant's argument on this issue proceeds along

---

the opinion announcing the judgment observed that '[t]he death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders.' 428 U. S., at 183 (footnote omitted)."

[125]*See State v. Price,* 33 Wn. App. 472, 474, 655 P.2d 1191 (1982); *State v. Levage,* 23 Wn. App. 33, 35, 594 P.2d 949 (1979).

the following lines: the omission of a presumption of innocence instruction in a criminal case is a constitutional error which requires reversal (citing *State v. McHenry*, 88 Wn.2d 211, 213–14, 558 P.2d 188 (1977)); the presumption he advocates in this case (*i.e.*, that there are sufficient mitigating circumstances to merit leniency) is likewise constitutionally required; that even though the defendant at trial proposed no instruction on this sufficient mitigating circumstances presumption (and took no exception to instruction 4 on that or any other basis), this being a constitutional error, this court is nonetheless compelled to consider it (RAP 2.5) and should on this basis reverse the defendant's conviction.

The flaw in the defendant's argument is that there is no constitutional right to a presumption of sufficient mitigating circumstances to merit leniency. The presumption of innocence, on the other hand, lies at the very foundation of the administration of our criminal law; its antecedents have been traced from Deuteronomy, through Roman law, English common law and the common law of the United States.[126] There is simply no equivalent ancient antecedent or similar constitutionally required presumption with respect to "sufficient mitigating circumstances to merit leniency" for a person who has already been convicted of aggravated murder in the first degree. Thus, there is no reviewable claim of error in this regard.

Lack of an instruction stating that the fact the defendant did not testify in the special sentencing proceeding is not to be used against him. (Issue 28). Had such an instruction been requested, it presumably would have been given. Here, however, it was unnecessary in any event. This is because the defendant's testimony was actually before the jury since the defendant had testified at the guilt phase, and by instruction 1 that testimony was before the jury for its consideration in the penalty phase.

---

[126]*Coffin v. United States*, 156 U.S. 432, 453–54, 39 L. Ed. 481, 15 S. Ct. 394 (1895).

Whether there was a failure to instruct the jury, during the penalty phase, as to the consequences of its decision (as required by RCW 10.95.060(1)). (Issue 29). There was no such failure. At the outset of the penalty phase, the trial court specifically informed the jury that "[t]he sentence will be either life imprisonment without the possibility of parole, or the death penalty." The penalty phase special verdict also made this entirely clear.

Whether that part of instruction 1, which informed the jury it could consider the testimony and evidence admitted at the guilt phase, was improper and an unconstitutional comment on the evidence (Const. art. 4, § 16). (Issue 30). As discussed in connection with Issue 14, this part of the instruction was proper. Similarly, it was not a comment on the evidence because it did not convey to the jury the personal attitudes of the judge toward the merits of the cause.[127]

Whether the instructions improperly compelled the jury to reach unanimity. (Issue 31). They did not. The instructions, particularly when read together with the last paragraph of the special verdict, gave the jury the option to not unanimously agree to any answer to the statutory question (RCW 10.95.060(4)) before the jury.

Whether the relevant factors the jury could consider in deciding the statutory question at issue (see instruction 3, para. (3)) should have included all eight "relevant factors" listed in the statute (RCW 10.95.070), rather than just the three that it did. (Issue 32). This is the converse of the question as it has usually been presented with respect to that statute (i.e., the listing of all eight statutory "relevant factors" in the instruction imparted prejudicial error into the case).[128] The eight factors contained in RCW 10.95.070

---

[127]*State v. Foster*, 91 Wn.2d 466, 481, 589 P.2d 789 (1979); *State v. Johnson*, 29 Wn. App. 807, 810–11, 631 P.2d 413 (1981).

[128]*State v. Rupe*, 101 Wn.2d 664, 701, 663 P.2d 571 (1984); *State v. Campbell*, 103 Wn.2d 1, 28, 691 P.2d 929 (1984), *cert. denied*, ___ U.S. ___, 85 L. Ed. 2d 526, 105 S. Ct. 2169 (1985).

merely provide a guide to the nature and function of mitigating circumstances; they serve as illustrations of the factors the jury might wish to consider in determining if there are sufficient mitigating circumstances to merit leniency.[129] The colloquy between court and counsel at the time the penalty phase jury instructions were settled shows that the trial court gave defense counsel the option of having any of the statutory mitigating factors included in instruction 3 that he chose. As previously discussed, the mitigating circumstances instruction, instruction 5, also gave defense counsel a broad range within which to argue. There was no error.[130]

Whether a single special verdict form was appropriate at the penalty phase. (Issue 33). Defendant's argument on this point is much the same as it was with respect to the special verdict in the guilt phase; our answer is also much the same.[131] The jury was instructed at the penalty phase that it had to unanimously agree on the answer to the question in issue,[132] and the verdict contained a place to so specify in the event the jury could not unanimously agree. There was no inappropriate requirement of unanimity. Furthermore, there was no issue in either phase of the trial as to there being any difference in either the crime or the defendant's situation with respect to any one victim as compared with any other victim. This was not error.[133]

ISSUES THIRTY–FOUR through FORTY–NINE. The defendant concludes his assignments of error with a listing of what he considers to be 14 fatal defects in Washington's capital punishment statutes plus two other claims in what he terms "supplemental assignments of error".

---

[129]*Campbell,* at 28.

[130]*State v. Jeffries,* 105 Wn.2d 398, 420, 717 P.2d 722 (1986).

[131]See Issue 21.

[132]Court's instruction 6 (penalty phase).

[133]*See Jeffries,* at 419–20.

CONCLUSION. We conclude that these 16 final assignments of error are without merit.

The claimed defects in the capital punishment statutes raise the following 14 issues. Issue 34: Does RCW 10.95.040 violate the separation of powers doctrine? Issue 35: Should the defendant have been charged by grand jury indictment instead of by information? Issue 36: Did the combined effect of RCW 10.95.040 and not obtaining a grand jury indictment exacerbate the claimed violation of the separation of powers doctrine? Issue 37: Does RCW 10.95.040 violate the equal protection clauses of the federal and state constitutions? Issue 38: Is RCW 10.95 unconstitutionally void for vagueness? Issue 39: Does RCW 10.95 constitute an unlawful delegation of legislative authority to the executive branch of government? Issue 40: Does RCW 10.95 promote unequal administration of law in violation of the Fourteenth Amendment? Issue 41: Do the capital punishment statutes constitute, in effect, a mandatory death penalty statute in violation of the Eighth Amendment and article 1, section 14 of this state's constitution?

We continue our listing of the issues raised by the statutory defects the defendant claims are contained in the capital punishment statutes. Issue 42: Is RCW 10.95.060(4) unconstitutional because it shifts the burden of proof on the death penalty issue to the defendant? Issue 43: Because the statutes do not require jury articulation of which mitigating circumstances were found and how they were weighed, do they deny the defendant's right to appellate review? Issue 44: Is RCW 10.95.130(2)(b) a legislative encroachment upon an exclusively judicial function, hence a violation of the separation of powers doctrine? Issue 45: Does RCW 10.95.120 deny a defendant the right to rebut information given to the trial judge? Issue 46: Is RCW 10.95.020 unconstitutional because it does not genuinely narrow the class of persons eligible for the death penalty? And, Issue 47: Is RCW 10.95 unconstitutional because the death penalty constitutes cruel and unusual punishment?

The issues raised by what the defendant terms "supple-

mental assignments of error" are two. Issue 48: Was it error to exclude for cause all jurors who held absolute scruples against the death penalty? Issue 49: Did the jury, by finding two aggravating factors, violate defendant's double jeopardy rights by imposing multiple punishments for the same act?

The foregoing issues have been answered in the negative in this opinion, or in our recent opinions in the following cases: *State v. Jeffries*, 105 Wn.2d 398, 717 P.2d 722 (1986); *State v. Bartholomew*, 104 Wn.2d 844, 710 P.2d 196 (1985) (*Bartholomew* III); *State v. Benjamin Ng*, 104 Wn.2d 763, 713 P.2d 63 (1985); *State v. Kincaid*, 103 Wn.2d 304, 692 P.2d 823 (1985); *State v. Campbell*, 103 Wn.2d 1, 691 P.2d 929 (1984), *cert. denied*, ___ U.S. ___, 85 L. Ed. 2d 526, 105 S. Ct. 2169 (1985); *State v. Dictado*, 102 Wn.2d 277, 687 P.2d 172 (1984); *State v. Rupe*, 101 Wn.2d 664, 683 P.2d 571 (1984); *State v. Bartholomew*, 101 Wn.2d 631, 683 P.2d 1079 (1984) (*Bartholomew* II); *State v. Bartholomew*, 98 Wn.2d 173, 654 P.2d 1170 (1982), *State's cert. granted*, 463 U.S. 1203, 77 L. Ed. 2d 1383, 103 S. Ct. 3530, *defendant's cert. denied*, 463 U.S. 1212, 77 L. Ed. 2d 1395, 103 S. Ct. 3548 (1983) (*Bartholomew* I). No useful purpose would be served by again plowing this same ground; therefore, we decline to do so.

ISSUES FIFTY through FIFTY-TWO. These three issues are those specifically posed by the Legislature for this court to answer in our appellate review of all death sentences. The statute so requiring states the questions for us to determine as follows:

(a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95-.060(4); and

(b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital pun-

ishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120; and

(c) Whether the sentence of death was brought about through passion or prejudice.

RCW 10.95.130(2)(a)–(c) (part).

Sufficiency of the evidence. (Issue 50). The question the jury was required to answer was, of course, this: "[h]aving in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"[134] At the penalty phase, the jury returned a unanimous special verdict answering this question "yes".

▮▮▮ We perform the first aspect of our sufficiency of the evidence review function by using the analysis that, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify this affirmative finding beyond a reasonable doubt. This is the *Jackson v. Virginia,* 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979) test for sufficiency of the evidence (adopted by this state in *State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980)) and which we here apply to the first question posed by the statute.[135]

Viewing the evidence concerning the facts of the crime according to this test, the crime of which the defendant was found guilty was the intentional premeditated murder of 13 people, during the course of a robbery and for cover up purposes. The mitigating factors the defendant claimed were: (1) his age—he was in his early twenties; (2) that he was an accomplice to a murder committed by another person where his participation in the murder was minor; and (3) he acted under duress or domination of another

---

[134]RCW 10.95.060(4).

[135]*See Justus v. State,* 247 Ga. 276, 280, 276 S.E.2d 242, *cert. denied,* 454 U.S. 882, 70 L. Ed. 2d 193, 102 S. Ct. 366, *reh'g denied,* 454 U.S. 1093, 70 L. Ed. 2d 633, 102 S. Ct. 661 (1981); *McClesky v. State,* 245 Ga. 108, 115, 263 S.E.2d 146, *cert. denied,* 449 U.S. 891, 66 L. Ed. 2d 119, 101 S. Ct. 253 (1980).

person.[136] The jury by its verdict showed that it likely did not believe either the second or the third mitigating factors. The defendant was armed, but whether the jury decided he was a "triggerman" or not is unknown. Even if he was not a "triggerman", however, that is not determinative where, as here, the evidence is overwhelming that he is the one who planned, supervised and helped carry out the killings in order to conceal his identity and that of his confederates.

We conclude here, as the court concluded in *Campbell,* 103 Wn.2d at 29, that "we too find it difficult to find sufficient mitigating circumstances to merit leniency. Thus we conclude there was sufficient evidence to justify the jury's affirmative finding."

Was the defendant's sentence of death excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant? (Issue 51). For the reasons discussed at length under Issue 15, we answer this question "no".

Whether the sentence of death was brought about through passion or prejudice? (Issue 52). In this connection, the defendant in his brief reiterates various of his allegations of error previously raised and separately discussed above. No valid purpose would be served by reiterating our decisions on these matters here; suffice to say, they do not constitute a showing that the sentence of death was brought about through passion or prejudice. No other competent evidence was presented showing that the death sentence in this case came about through passion or prejudice. We further note that the defendant did not at any time seek a change of venue from King County, either before or after the very extensive voir dire examination of jurors, thus at least suggesting that the defendant felt he could receive a fair trial in King County.

To sum up. We have conducted a detailed review of the lengthy record of this trial, and have read and reread the voluminous briefs filed herein. We are satisfied that none of

---

[136] See court's instruction 3 (penalty phase).

the assignments of error is well taken and that none of the issues raised shows reversible error. The defendant was fairly tried, convicted on all counts and sentenced to pay the supreme penalty prescribed by the laws of this sovereign state.

Affirmed.

DOLLIVER, C.J., and BRACHTENBACH, DORE, CALLOW, GOODLOE, and DURHAM, JJ., concur.

UTTER, J. (dissenting)—I disagree with the majority's disposition of appellant Mak's claims concerning admission of certain evidence during both the guilt and sentencing phases of the trial which connected a third party to the crimes at the Wah Mee Club. My more fundamental concerns with the constitutional objections to the death penalty statute have already been discussed, *see State v. Campbell*, 103 Wn.2d 1, 41, 691 P.2d 929 (1984) (Utter, J., concurring in part, dissenting in part), *cert. denied*, 105 S. Ct. 2169 (1985). These address many of the other issues raised by the defendant and I refer the court to them.

There would seem to be little that could be said that might convince a jury that one who participated in the killing of 13 people should have his life spared. And yet, under the bizarre facts of this case, two of the three participants in this crime have been spared the death penalty. One, Tony Ng, because he escaped to Canada, could not be charged with a capital offense and be successfully extradited to the United States. The other participant, who fired most of the shots, did not receive the death penalty. Only one actor in this most brutal of all killings committed within this state received the death penalty. The appellant here was characterized by the State as the planner, the one who orchestrated the whole event, and on this basis the State argued, as one of its two distinct grounds, that he deserved the death penalty when the other two participants in this crime did not.

The defendant attempted to introduce evidence from

which he could argue someone else in fact orchestrated the crime and, in particular, that Benjamin Ng's role, as the one firing most of the shots, was more central than the prosecution had maintained. To fail to allow this evidence before the jury is something I cannot reconcile with either our statutory procedures or constitutional due process. The evidence should have been admitted in at least the penalty phase of the trial under RCW 10.95.060. It also was properly offered in the guilt phase of the trial and admissible under ER 401.

I

The rule for the admission of mitigating evidence at the sentencing phase of capital cases was stated in *Lockett v. Ohio,* 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978):

> the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

(Footnote omitted.) 438 U.S. at 604, *cited with approval in State v. Bartholomew,* 101 Wn.2d 631, 645–46, 683 P.2d 1079 (1984). This rule recognizes that corrective mechanisms are not available in capital cases. 438 U.S. at 605. *See also Eddings v. Oklahoma,* 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982).

In the present case, of course, the relevant Washington statute permits the defendant to present any relevant evidence, regardless of its admissibility under the rules of evidence. RCW 10.95.060. *See also State v. Bartholomew,* 101 Wn.2d at 642; *State v. Rupe,* 101 Wn.2d 664, 701, 683 P.2d 571 (1984). Despite this, in sentencing appellant, the trial judge refused to allow the jury to consider evidence that, if taken as true, may well have influenced the jury to impose a lesser sentence. The majority only concludes, without discussion, that this evidence was neither relevant nor probative.

Washington Rule of Evidence 401 defines "relevant evi-

dence" as follows:

> evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

*See also* Black's Law Dictionary 1160 (5th rev. ed. 1979). Furthermore, this court has declared the test of relevancy to be "whether the evidence has a '"tendency to make the existence" of the fact to be proved "more probable or less probable than it would be without the evidence'." *State v. Renfro*, 96 Wn.2d 902, 906, 639 P.2d 737 (1982), *cert. denied*, 459 U.S. 842, 74 L. Ed. 2d 86, 103 S. Ct. 94 (1983). In *State v. Rupe, supra* at 686–89, we concluded that evidence that tended to increase the probability of defendant's guilt was relevant. Likewise, evidence that tends to decrease the probability of a defendant's guilt is relevant.

The majority's classification of the proffered evidence as neither relevant nor probative is not warranted. Appellant Mak's offer of proof consisted of the following evidence: (1) a third party planned to control gambling in the International District; (2) the third party contacted Benjamin Ng on the day of the Wah Mee killings; (3) the party was a "banker" for an International District gambling club that had just closed down; (4) an informant told the police that this person directed young gang members; (5) Benjamin Ng's car had been seen at the person's restaurant an hour before the crime; and (6) the person offered to sell Benjamin Ng a bulletproof vest a week before the Wah Mee incident.

Without this evidence, the jury was unaware of a possible third party connection, a connection about which appellant Mak claims he was ignorant. Because the evidence, if believed, tended to decrease appellant Mak's guilt, it was relevant under the definition outlined in *Renfro* and ER 401.

However, even if the evidence was not admissible under the definition outlined in ER 401, that definition is not controlling. RCW 10.95.060. Less restrictive standards for

relevance and probative value are applied to evidence of mitigating circumstances at the sentencing phase of trial. *State v. Bartholomew,* 101 Wn.2d 631, 683 P.2d 1079 (1984). This is because "when a jury is faced with the question whether or not the defendant should be put to death, the defendant should be allowed to submit *any* evidence of . . . the circumstances of the offense . . ." (Italics mine.) 101 Wn.2d at 646 (citing *Lockett v. Ohio,* 438 U.S. at 604). Evidence of the involvement of a third party is clearly relevant to the jury's decision to sentence Mak and directly relevant to answer the State's claim that the defendant alone in this case deserved to die. *See Blankenship v. State,* 251 Ga. 621, 308 S.E.2d 369 (1983).

Where, as here, appellant has presented evidence regarding the involvement of a third party, such evidence should be received during the sentencing phase of the trial. Such evidence assures that the appellant is judged as an individual. *See Lockett v. Ohio, supra.* Since, under ER 401 and RCW 10.95.060 the evidence was relevant, the trial court erred in refusing to receive this evidence during the sentencing phase of trial.

## II

Additionally, the majority concludes that the statement by the third party to Benjamin Ng, which would have established the necessary foundation for appellant Mak's offer of proof, is hearsay. Although hearsay, the statement was admissible under ER 804(b)(3).

ER 804(b)(3) provides:

**(b) Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . .

(3) *Statement Against Interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement

tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Although the offer to sell a bulletproof vest to Benjamin Ng 1 week before the Wah Mee murders is not a direct statement against the third party's interest, that fact is not controlling. The statement "need not have been a clear and unequivocal admission of criminal conduct." *State v. Parris*, 98 Wn.2d 140, 149, 654 P.2d 77 (1982). All that is required is that the declaration would tend to subject him to criminal liability. *United States v. Barrett*, 539 F.2d 244 (1st Cir. 1976), *cited with approval in State v. Parris, supra.*

In *Barrett*, the defendant offered witness testimony which tended to exculpate him as a participant in the theft and sale of a stamp collection. The Court of Appeals for the First Circuit held that the remarks tended to subject the declarant, Tilley, to criminal liability because they strongly implied his participation in the stamp crimes. *Barrett*, at 251.

Other jurisdictions have also followed the rule that a declaration against interest is not confined to "clear confessions." In *United States v. Alvarez*, 584 F.2d 694 (5th Cir. 1978), the court held that statements made for the purpose of setting up a drug transaction were against declarant's penal interest. *See also United States v. Bagley*, 537 F.2d 162 (5th Cir. 1976); *United States v. Benveniste*, 564 F.2d 335 (9th Cir. 1977).

Here, declarant offered to sell a bulletproof vest to Benjamin Ng. Although this statement does not clearly and unequivocally amount to an admission of criminal conduct, it does imply that the declarant was involved in the Wah Mee murders. Thus, the statement was made in furtherance of a criminal act and qualifies as an admission against penal interest within the holding set by *Barrett* and cited with approval in *Parris*.

The statement also satisfies the other two prerequisites

of ER 804(b)(3). First, the declarant must be unavailable despite good faith efforts to locate him. *State v. Valladares,* 99 Wn.2d 663, 668, 664 P.2d 508 (1983). In this case, appellant offered to call the declarant as a witness himself, but was refused. Thus, appellant made a good faith effort to avail the declarant to the court within the prerequisites of ER 804(b)(3).

Secondly, the statement was accompanied by corroborating circumstances indicating its trustworthiness. *Valladares,* 99 Wn.2d at 668. Among other factors in evaluating the trustworthiness of extrajudicial statements, consideration should be given to the close proximity of the declaration to the crime, whether the statements were spontaneous and against declarant's penal interest, and whether there was apparent reason for declarant to lie. *State v. Dictado,* 102 Wn.2d 277, 288, 687 P.2d 172 (1984) (citing *State v. Boast,* 87 Wn.2d 447, 553 P.2d 1322 (1976)).

Here, the statement was made only 1 week before the murders. Secondly, as discussed above, the statement was against the declarant's penal interest, and finally, the statement was inculpatory rather than exculpatory, implicating only the declarant. Thus, it was not in declarant's interest to lie. *See State v. Parris,* 98 Wn.2d 140, 154, 654 P.2d 77 (1982) (Williams, J., dissenting).

Because I believe that the statement should have been admitted, I further conclude that appellant's offer of proof satisfied the test stated in *State v. Downs,* 168 Wash. 664, 667, 13 P.2d 1 (1932) (majority, at 716). The trial court erred in refusing the appellant's offer of proof.

### III

The trial court's refusal to admit the evidence raises, in turn, a proportionality issue, which the majority does not discuss. For the same crimes, Benjamin Ng received a life sentence, while appellant Mak must die. The State justifies this result on two grounds: (1) Mak is characterized as the one who orchestrated the crime, Ng's role being similar only in that he also participated in the crime, Brief of

Respondent, at 88; (2) personal differences between Ng and Mak justify the different results.

My quarrel is with the first of these two bases. Had the contested evidence been admitted, it could have raised doubts about Mak's alleged autonomy and control in the crime. Because the issue of Mak's control was so central to the penalty proceedings, the evidence of a third party's involvement in the crime was relevant both to the issue of control and the issue of premeditation. The jury itself should have been allowed to weigh that evidence in determining whether Mak should die while his accomplices live. This seems especially true when the State has conceded that it believes Ng, not Mak, killed most of the victims. Brief of Respondent, at 15, 88. Presented with evidence rebutting Mak's control, as well as State concessions that Ng fired most of the shots, a jury might well have been reluctant to sentence Mak to death, knowing that Ng would be spared. Neither we, nor Mak, will ever know. Mak, however, has less time to speculate about the possibility.

As I have indicated elsewhere, *see Campbell,* 103 Wn.2d at 41 (Utter, J., concurring in part, dissenting in part), I do not believe that our death penalty statute meets constitutional standards. Nevertheless, even conceding that issue, I would hold, for the above reasons, that the trial court erred in refusing to admit the evidence and would remand so that the jury might consider *all* relevant evidence before it decided that Mak should die while his coconspirators live.

PEARSON, J., concurs with UTTER, J.

Reconsideration denied August 19, 1986.